UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

I.M., an infant by her mother and natural
guardian, and DANIELLE HARTMANN,
individually,

                         Plaintiffs,

      -v-

UNITED STATES OF AMERICA, ORANGE
REGIONAL MEDICAL CENTER, RAJA
SENGUTTUVAN, M.D., AMANDA HINES,
N.P., KIRANKUMAR KANTAL KOTHARI,
M.D., NORTH AMERICAN PARTNERS IN
ANESTHESIA, L.L.P., and ALICE BACH
BAST, R.N.,

                         Defendants.

No. 16-CV-7608 (KMK)

OPINION & ORDER

Appearances:

Jordan K. Merson, Esq.
Merson Law, PLLC
New York, NY
*Counsel for Plaintiffs*

John J. Barbera, Esq.
Diana V. Mauro, Esq.
Hyungjin S. Ryu, Esq.
Ruth A. Ragan, Esq.
Martin Clearwater & Bell LLP
New York, NY and White Plains, NY
*Counsel for Defendants Orange Regional Medical Center and Alice Bast, R.N.*

Jayne L. Brayer, Esq.
Birbrower, Beldock & Tangredi, LLP
White Plains, NY
*Counsel for Defendants Orange Regional Medical Center and Alice Bast, R.N.*

James P. Connors, Esq.
Christopher T. Rogers, Esq.
Catalano Gallardo & Petropoulos, LLP
Jericho, NY

*Counsel for Defendant Amanda Hines, N.P.*

Eric A. Curtis, Esq.
Baker Sanders LLC
Garden City, NY
*Counsel for Defendant Amanda Hines, N.P.*

Benjamin M. Wright, Esq.
James R. Denlea, Esq.
John L. Leifert, Esq.
Peter N. Freiberg, Esq.
Denlea & Carton LLP
White Plains, NY
*Counsel for Defendant Raja Senguttuvan, M.D.*

KENNETH M. KARAS, District Judge:

Danielle Hartmann ("Ms. Hartmann"), individually and as mother and natural guardian of

I.M., an infant, and I.M., an infant by her mother and natural guardian, Ms. Hartmann

(collectively, "Plaintiffs"), bring this Action against Raja Senguttuvan, M.D.

("Dr. Senguttuvan"), Amanda Hines, N.P. ("Nurse Hines") (collectively, "neonatal

Defendants"), Orange Regional Medical Center ("ORMC"), Alice Bast, R.N. ("Nurse Bast"),

Kirankumar Kantal Kothari, M.D. ("Dr. Kothari"), North American Partners in Anesthesia,

L.L.P. ("NAPA"), and the United States of America ("United States") (collectively,

"Defendants"), pursuant to the Federal Tort Claims Act ("FTCA"), 28 U.S.C. §§ l346(b),

1402(b), 240l(b), and 2671−80, and New York State law.  Plaintiffs allege medical malpractice,

lack of informed consent, and loss of services, as to all Defendants except the United States, and

negligent hiring, supervision, and retention as to ORMC.  (*See Compl.* (Dkt. No. 1).)[1]  Before the

---

[1] By Stipulation dated January 18, 2017, the Parties agreed that Defendants Lynne
DiCostanzo, M.D. ("Dr. DiCostanzo"), Natalie Jouve, M.D. ("Dr. Jouve"), Nicole Blair, M.D.
("Dr. Blair"), Nila Singaravelu, M.D. ("Dr. Singaravelu"), and Belinda Rubino, N.P. ("Nurse
Rubino"), who were originally named in the Complaint, were employees of the Middletown
Community Health Center ("MCHC"), that MCHC was a part of the Public Health Service, and
that these Defendants were thus employees of the United States Government under the Federally

Court are Nurse Hines's Motion for Summary Judgment (Hines's Not. of Mot. (Dkt. No. 111)),

ORMC and Nurse Bast's Motion for Summary Judgment (ORMC and Bast's Not. of Mot. (Dkt.

No. 115)), and Dr. Senguttuvan's Motion for Summary Judgment (Senguttuvan's Not. of Mot.

(Dkt. No. 124)).  For the following reasons, Defendants' Motions are granted in part and denied

in part.

## I.  Background

### A.  Factual Background

The following facts are taken from the Parties statements pursuant to Local Civil Rule

56.1, specifically Nurse Hines's 56.1 statement (Def. Hines's Rule 56.1 Statement ("Hines's

56.1") (Dkt. No. 114)), ORMC and Nurse Bast's 56.1 statement (Defs. ORMC and Bast's Rule

56.1 Statement ("ORMC and Bast's 56.1") (Dkt. No. 122)), Dr. Senguttuvan's 56.1 statement

(Def. Senguttuvan's Rule 56.1 Statement ("Senguttuvan's 56.1") (Dkt. No. 127)), Plaintiffs'

response and counterstatement (Pls.' Resp. and Counterstatment to Defs.' 56.1 Statements ("Pls.'

56.1") (Dkt. No. 137)), Nurse Hines's counterstatement (Def. Hines's Rule 56.1

Counterstatement ("Hines's 56.1 Counter") (Dkt. No. 145)), ORMC and Nurse Bast's

counterstatement (Defs. ORMC and Bast's Rule 56.1 Counterstatement ("ORMC and Bast's

56.1 Counter") (Dkt. No. 141)), and the admissible evidence submitted by the Parties, and are

Supported Health Centers Assistance Act of 1995, 42 U.S.C. § 201 *et seq*.  (Stipulation ¶¶ 1–5
(Dkt. No. 72).)  These individual Defendants were dismissed from this Action without prejudice
because the exclusive remedy for their alleged negligent acts and ommissions is an FTCA suit
against the United States.  The Parties also agreed that the FTCA provides the exclusive remedy
with respect to Plaintiffs' claims against the United States, (Stipulation ¶¶ 1–5), and therefore
agreed to dismiss without prejudice Plaintiffs' Fifth Cause of Action against the United States for
negligent hiring, supervision, and/or retention, (*id*. ¶ 7).

recounted in the light most favorable to Plaintiffs, the non-movants. The facts as described

below are not in dispute, except to the extent indicated.[2]

### 1. Labor and Delivery Care

In June 2014, Ms. Hartmann learned she was pregnant with I.M. by a positive home

pregnancy test. The pregnancy was later confirmed by a physician at MCHC. Ms. Hartmann

received prenatal care at MCHC with Dr. Singaravelu, Dr. Blair, and Nurse Rubino. She chose

MCHC for her prenatal care as this was the closest facility that Medicaid approved. (Pls.' 56.1

¶ 175.) Ms. Hartmann was 24 years old at the time. (*Id.* ¶ 6.)

At the end of February 2015, Ms. Hartmann presented to Bon Secours Hospital for a

routine sonogram. Ms. Hartmann testified that Nurse Rubino told her the baby was large and Dr.

Blair would have to schedule an induction at ORMC. (*Id.* ¶ 176.) At that time, Ms. Hartmann

was told to go home and wait for a call for the induction date. Her birthing plan was to deliver at

---

[2] Local Civil Rule 56.1(a) requires the moving party to submit a "short and concise statement, in numbered paragraphs, of the material facts as to which the moving party contends there is no genuine issue to be tried." The nonmoving party, in turn, must submit "a correspondingly numbered paragraph responding to each numbered paragraph in the statement of the moving party, and if necessary, additional paragraphs containing a separate, short[,] and concise statement of additional material facts as to which it is contended that there exists a genuine issue to be tried." Local Civ. R. 56.1(b).

Plaintiffs' 56.1 response and counterstatement addresses each of the Defendants' 56.1 statements, including verbatim each of the Defendants' statements and Plaintiffs' response to each immediately below it. Plaintiffs' 56.1 response and counterstatement, however, does not use "correspondingly numbered paragraph[s]," so that the paragraph numbers in Plaintiffs' submission do not correspond to the paragraph numbers in Defendants' 56.1 statements. The Court is nonetheless able to discern which of Defendants' statements Plaintiffs are responding to. Where a statement is uncontested, the Court will cite to the paragraph number in Plaintiffs' 56.1 response and counterstatement.

Where possible, the Court has relied on the undisputed facts in Plaintiffs' 56.1 statement. However, direct citations to the record have also been used where relevant facts were not included in any of the Parties' Rule 56.1 submissions, or where the Parties did not accurately characterize the record.

ORMC, with the assigned physician employed at MCHC on the day of her delivery. Ms. Hartmann knew that MCHC patients delivered at ORMC. (*Id*.)

Ms. Hartmann's estimated due date was March 1, 2015. (Pls.' 56.1 ¶ 7.) On March 5, 2015, at approximately 11:00 p.m., Ms. Hartmann's water broke while she was in her home. Her contractions were about five minutes apart. She immediately called ORMC to inform them of her expected arrival. (*Id*. ¶ 177.) She called her mother, who drove her to ORMC. They arrived at ORMC around 12:00 a.m. on March 6, 2015. They waited in the Emergency Room for approximately fifteen minutes before being taken upstairs to a room in Labor and Delivery. (*Id*.)

A nurse was present in the room when Ms. Hartmann arrived and took her vital signs. Ms. Hartmann testified that during the time period from 12:00 a.m. to 2:00 a.m., a nurse placed an intravenous line ("IV") in her arm, connected her to a fetal heart monitor, and did not palpate her stomach or physically touch her for an examination. (*Id*. ¶ 178.) A female physician came to her room for the first time around 2:00 a.m. and did a vaginal examination. (*Id*.) Ms. Hartmann was 2.3 cm dilated and was told she would receive Pitocin if the labor was not progressing. (*Id*.) The examination took approximately five minutes and a vaginal delivery was still anticipated as there were no complications and Ms. Hartmann had had a prior vaginal delivery with her son. (*Id*.)

Between 2:00 a.m. and 6:30 a.m., Ms. Hartmann periodically walked around and rested in bed. (*Id*. ¶ 179.) Around 6:30 a.m., Ms. Hartmann asked for an epidural as her contractions were worsening. (*Id*.) When she received the epidural, the baby's heart rate decreased. Ms. Hartmann was given oxygen and positioned onto her left side. (*Id*.) The fetal heart rate returned to normal after ten minutes. (*Id*.) An injection of Pitocin was ordered by Dr. Jouve and administered approximately thirty minutes after the epidural to augment labor. (*Id*.) Nurse Bast

was the labor and delivery nurse assigned to Ms. Hartmann's delivery. (*Id.* ¶ 309.) Nurse Bast was as employee of ORMC. (Decl. of Jayne L. Brayer, Esq. ("Brayer Decl.") Ex. I., at 9–10 (Nurse Bast's Deposition Transcript ("Bast Dep.") (Dkt. No. 120).)

The Labor and Delivery Admission History and Physical Note at 2:32 a.m. reflects that Ms. Hartmann was having contractions every five minutes and her cervix was 2cm dilated, 60% effaced, and the fetus was at -3 station. (Pls.' 56.1 ¶ 8.) The plan was for expectant management, labs, an epidural when needed, with a vaginal delivery expected. (*Id.* ¶ 9.)

Dr. DiCostanzo is an obstetrician-gynecologist ("OBGYN"). (Brayer Decl. Ex. H., at 11–12 (Dr. DiCostanzo's Deposition Transcripts ("DiCostanzo Dep.").) In March 2015 she was employed by MCHC and had privileges at ORMC. (DiCostanzo Dep. 15.) Dr. DiCostanzo testified that there was always an OBGYN from MCHC on call for ORMC, (*id.* at 22), and that whenever an MCHC patient was at ORMC, someone from ORMC would contact MCHC staff to let them know, (*id.* at 23). Dr. DiCostanzo worked a shift at ORMC from 8:00 a.m. on March 6, 2015, to 8:00 a.m. on March 7, 2015. (*Id.* at 21.) A site manager at MCHC set Dr. DiCostanzo's schedule. (*Id.* at 21–22.) When Dr. DiCostanzo managed labor and deliveries at ORMC, she managed those cases with hospital staff and nurses from ORMC. (*Id.* at 25.)

Dr. DiCostanzo testified that she first examined Ms. Hartmann at 9:26 a.m. on March 6, 2015. (*Id.* at 181.) When Dr. DiCostanzo examined her, there was a gush of meconium[3] stained fluid and, with that gush, Dr. DiCostanzo felt the cord come down. (*Id.* at 182–84.) After Dr. DiCostanzo diagnosed the cord prolapse, Nurse Bast summoned help by yelling "cord prolapse" so that about twelve people rushed into the room. (*Id.* at 185–86.) They called all the relevant

---

[3] Meconium is "a dark greenish mass that accumulates in the bowel during fetal life and is discharged shortly after birth." Meconium, Merriam-Webster's Online Dictionary, https://www.merriam-webster.com/dictionary/meconium (last visited Nov. 28, 2018).

departments to prepare for a stat caesarian section ("c-section").  (*Id*. at 186–87.)  Nurse Bast turned off the Pitocin, increased fluids, repositioned Ms. Hartmann and gave her oxygen.  (Aff. of Christopher Rogers, Esq. ("Rogers's Aff.") Ex. D, at 17 (Dkt. No. 111–12) (ORMC records pertaining to Ms. Hartmann ("Hartmann ORMC Rec.").)[4]  Dr. DiCostanzo kept her hand in Ms. Hartmann's vagina and uterus.  (*Id*. at 185.)  The cord was still pulsating.  (*Id*.)  Dr. DiCostanzo lifted the cord above the baby's head and, since Ms. Hartmann was eight centimeters dilated, had her push twice to attempt a vaginal delivery.  (*Id*.)

Plaintiffs correctly point out that the ORMC record pertaining to Ms. Hartmann includes a note that Dr. DiCostanzo first examined Ms. Hartmann at 9:24 a.m. and called for the stat c-section at 9:26 a.m., not that she first examined her at 9:26 a.m.  (Pls.' 56.1 ¶ 180 (citing Hartmann ORMC Rec. 18).)  Ms. Hartmann testified that Dr. DiCostanzo examined her for about five minutes before she felt the cord prolapse and before ordering the emergency c-section.  (Rogers's Aff. Ex. F, at 123 (Ms. Hartmann's Deposition Transcript ("Hartmann Dep.").).)

Ms. Hartmann was taken to the operating room ("OR") at 9:38 a.m.  (Pls.' 56.1 ¶ 13.)  She was in the OR by 9:41 a.m.  (*Id*. ¶ 14.)  The skin incision for the c-section procedure commenced at 9:52 a.m.  (*Id*. ¶ 15.)  Plaintiff I.M. was delivered at 9:54 a.m., weighing 9 pounds 7 ounces.  (*Id*. ¶ 16.)  Her gestational age was 40 weeks and five days.  (*Id*. ¶ 7.)

Dr. Kothari is an anesthesiologist.  On March 6, 2015, he was an employee of NAPA and provided anesthesiologic services at ORMC.  (Brayer Decl. Ex. L, at 10–12, 15 (Dr. Kothari's Deposition Transcript ("Kothari Dep.").)  There are usually multiple anesthesiologists from

---

[4] The Court notes that Nurse Hines attached the exhibits described in her attorney's declaration to her Motion Notice at Dkt. No. 111, not to the declaration itself at Dkt. No. 112. Where an exhibit consists of deposition transcripts, the Court will cite to the relevant page numbers of the transcript only rather than to the separate exhibits.

NAPA on the premises at ORMC. (Kothari Dep. 18.) Dr. Kothari testified that once Ms. Hartmann was brought to the OR, there was a "struggle" to transfer her to the OR table because her bed and the OR table were not aligned, and the bed needed to be moved closer to an outlet because there was no extension cord in the room at the time. (*Id*. at 72–83.)

Dr. DiCostanzo testified that from the time she diagnosed the cord prolapse to the time they left for the operating room, it was difficult to trace the baby's heart rate. She recalls that at one point the fetal heart rate increased above 80 beats per minute—there was a 10 second segment at 9:37 a.m. that registered at 180 beats per minute and Dr. DiCostanzo could not rule out that it was an artifact. (DiCostanzo Dep. 210–12.) Nurse Bast testified that from 9:25 a.m. onward, it was unknown if the fetal heart rate was bradycardic[5] or if the baby was suffering from hypoxia.[6] (Pls.' 56.1 ¶ 302.)

Nurse Bast testified that the last time she worked on a cord prolapse case, the baby was delivered in 16 minutes. (*Id*. ¶ 311.) Nurse Bast testified that it was her understanding that with a cord prolapse, the baby should be delivered in less than 30 minutes, "decision to incision," because there is decreased oxygenation to the fetus and the goal is to prevent hypoxemia and acidosis to the baby. (*Id*. ¶ 310.)

### 2. Initial Neonatal Care

Nurse Hines is a nurse practitioner. (Pls.' 56.1 ¶ 66.) She has a doctorate degree in Neonatology, a Certificate as a Neonatal Nurse Practitioner and Master's Degree in Nursing and

---

[5] Bradycardia is "an abnormally low rate of heartbeat." Bradycardia, The Free Dictionary, https://www.thefreedictionary.com/bradycardic (last visited Dec. 2, 2018).

[6] Hypoxia is "a deficiency of oxygen reaching the tissues of the body." Hypoxia, Merriam-Webster's Online Dictionary, https://www.merriam-webster.com/dictionary/hypoxia (last visited Dec. 2, 2018).

Health Care Administration. (*Id.* ¶ 68.) The Neonatal Resuscitation Program ("NRP") is an educational program in neonatal resuscitation run by the American Academy of Pediatrics and American Heart Association and is delineated in the Neonatal Resuscitation Textbook. (*Id.* ¶ 52.) NRP provides guidelines and protocols for neonatal resuscitation when there is perinatal distress. (*Id.* ¶ 70.) Nurse Hines is a NRP instructor and provider. (*Id.* ¶ 69.)

Nurse Hines testified that when she covered shifts at ORMC "an attending neonatologist [was] assigned as [her] backup, as a collaborating physician," (Rogers's Aff. Ex. G, at 10 (Nurse Hines's Deposition Transcript ("Hines Dep."))), and that this person supervised her and worked with her to make decisions about the neonates together, (Hines Dep. 12).[7]

Nurse Hines testified she arrived in the operating room about five minutes before Ms. Hartmann was wheeled in for her emergency c-section. (*Id.* at 59.) Nurse Hines testified that she confirmed that the operating room equipment was ready for resuscitation. This included ensuring that the radiant warmer was turned on, that the oxygen was turned on, that suction was

---

[7] Dr. Senguttuvan focused on this portion of Nurse Hines's testimony in which she refers to the attending doctor as her "back-up," (Senguttuvan 56.1 ¶ 2 (citing Hines Dep. 10)), and Plaintiffs point to the portion where Nurse Hines testified that the attending neonatologist supervised her, (Pls.' 56.1 ¶ 67 (citing Hines Dep. 12)). Nurse Hines testified that a supervising attending doctor was on call during her shifts and that she worked with this doctor to treat the neonates. That the Parties point to different parts of her testimony to describe this working relationship in competing terms does not create a factual dispute. Where the Parties identify disputed facts but with semantic objections only or by asserting irrelevant facts, these purported disputes, which do not actually challenge the factual substance described in the relevant paragraphs, will not be considered by the Court as creating disputes of fact. *See Baity v. Kralik*, 51 F. Supp. 3d 414, 418 (S.D.N.Y. 2014) ("Many of [the] [p]laintiff's purported denials—and a number of h[er] admissions—improperly interject arguments and/or immaterial facts in response to facts asserted by [the] [d]efendants, often speaking past [the] [d]efendants' asserted facts without specifically controverting those same facts."); *Pape v. Bd. of Educ. of Wappingers Cent. Sch. Dist.*, No. 07-CV-8828, 2013 WL 3929630, at *1 n.2 (S.D.N.Y. July 30, 2013) (explaining that the plaintiff's 56.1 statement violated the rule because it "improperly interjects arguments and/or immaterial facts in response to facts asserted by [the] [d]efendant, without specifically controverting those facts," and "[i]n other instances, . . . neither admits nor denies a particular fact, but instead responds with equivocal statements").

available, that the meconium aspirator was attached to the endotracheal tube and assembled correctly, and that the pulse oximeter was available.  (*Id.* at 65–66.)[8]

After I.M. was delivered at 9:54 a.m., she was brought to the radiant warmer.  (Pls.' 56.1 ¶ 19.)  Nurse Hines testified that she received the baby within 10 seconds of life after the umbilical cord was clamped and cut.  (Hines Dep. 87.)  The infant was pale, flaccid, unresponsive, and not breathing when she was given to Nurse Hines.  (Pls.' 56.1 ¶ 21.)  Nurse Hines testified she immediately intubated the baby within 20 seconds of life using a meconium aspirator with a 4.0 endotracheal tube.  (Hines Dep. 87, 89.)[9]

---

[8] With respect to several of Defendants' 56.1 statements, Plaintiffs respond, "Admit that this was [his or] her testimony," but do not offer any evidence to counter the statement.  (*See, e.g.,* Pls.' 56.1 ¶¶ 18, 20, 83.)  "If the opposing party . . . fails to controvert a fact set forth in the movant's Rule 56.1 statement, that fact will be deemed admitted pursuant to the local rule."  *Baity*, 51 F. Supp. 3d at 418 (internal quotation marks omitted); *see also T.Y. v. N.Y.C. Dep't of Educ.*, 584 F.3d 412, 418 (2d Cir. 2009) (same); *Holtz v. Rockefeller & Co.*, 258 F.3d 62, 73 (2d Cir. 2001) (explaining that the court is not required to search the record for genuine issues of material fact that the party opposing summary judgment failed to bring to the court's attention).  Where Defendants support their statements of fact with admissible evidence and Plaintiffs do not dispute those facts by pointing the Court to contravening admissible evidence in the record, the Court will deem Defendants' facts admitted.

[9] Plaintiffs argue that Nurse Hines's testimony that she intubated the baby within 20 seconds is inconsistent with her notes on her resuscitation attempts of I.M., which state that she "immediately intubated" the baby without specifying the exact time.  (Pls.' 56.1 ¶ 21 (citing Hines Dep. 91–92).)  Plaintiffs argue that although Nurse Hines testified that it is important to record the timing of neonatal resuscitative measures, (*id.* ¶ 23 (citing (Hines Dep. 91–92)), she did not record "a single time" in her notes, (*id.* ¶ 23 (Rogers's Aff. Ex. E, at 9 (ORMC records pertaining to I.M. ("I.M. ORMC Rec.")), and that this creates factual disputes about the timing of Nurse Hines's actions.  Plaintiffs, however, do not point to admissible evidence that contradicts Nurse Hines's testimony that she intubated the baby within 20 seconds.  "The principles governing admissibility of evidence do not change on a motion for summary judgment" and district courts need only consider admissible evidence in ruling on a motion for summary judgment.  *Raskin v. Wyatt Company*, 125 F.3d 55, 66 (2d Cir. 1997).  In the absence of contravening admissible evidence, Plaintiffs essentially criticize Nurse Hines's notes for not recording with greater specificity the exact times at which she took certain actions.

Nurse Hines's testimony is not inconsistent with her notes.  Her notes describe some time intervals at which she took certain resuscitation steps, and her testimony provides further details regarding those steps.  Although parties cannot create disputes as to material facts by

Within the first minute of life, the infant's heart rate was less than 50–60 beats per minute. (Hines's 56.1 ¶ 26.)[10]  A scant amount of meconium was suctioned, and the vocal cords were visualized with no meconium seen below the vocal cords. (Pls.' 56.1 ¶ 24.)  Nurse Hines then proceeded to dry and stimulate the baby. (*Id.* ¶ 25.)  Chest compressions were started and continued until the infant was re-intubated with a 3.5 endotracheal tube. (*Id.* ¶ 27.)  Nurse Hines observed the baby gasp two to three times at approximately two minutes of life. (Hines's 56.1 ¶ 28 (citing Hines Dep. 96; ORMC Rec. 9).)[11]  Bilateral breath sounds were heard, and the end

---

contradicting themselves, *see Brown v. Henderson*, 257 F.3d 246, 252 (2d Cir. 2001) ("[F]actual allegations that might otherwise defeat a motion for summary judgment will not be permitted to do so when they are made for the first time in the plaintiff's affidavit opposing summary judgment and that affidavit contradicts her own prior deposition testimony."), Nurse Hines's testimony is not inconsistent with, but is merely more specific than, the notes she took immediately during and after the resuscitation events.  "In determining whether summary judgment is appropriate," a court must "construe the facts in the light most favorable to the non-moving party and . . . resolve all ambiguities and draw all reasonable inferences against the movant." *Brod v. Omya, Inc.*, 653 F.3d 156, 164 (2d Cir. 2011) (citation and internal quotation marks omitted); *see also Wandering Dago, Inc. v. Destito*, 879 F.3d 20, 30 (2d Cir. 2018) (same).  Where Nurse Hines's testimony does not contradict but merely adds greater detail to her notes, and where Plaintiffs do not point to contravening admissible evidence, the Court deems Nurse Hines's statements as admitted.  The Court also notes that Nurse Hines's admission that it took 20 seconds is, at best, an inconsistency that benefits Plaintiffs.

Moreover, Nurse Hines testified that she did not write down the exact times at which she took certain steps because "it's a resuscitation and . . . things are happening very quickly," (Hines Dep. 96), and "[t]here's a timer on the warmer to give guidelines.  I'm focused on the baby," (*id.* at 97).

[10] Plaintiffs again dispute Nurse Hines's description of timing, (Pls.' 56.1 ¶ 26), but do not point to admissible evidence contradicting her assertion that this was the baby's heart rate within the first minute.  Nurse Hines's notes read in relevant part, "Proceeded to dry/stimulate; heart rate check less than 50-60, compressions started and continued until infant reintubated . . . compressions stopped.  Compressions approx 90 seconds." (I.M. ORMC Rec. 9.)  Nurse Hines's notes do not expressly state that I.M.'s heart rate was 50–60 *in the first minute* of life, but she testified that she intubated the baby "before one minute of life." (Hines Dep. 92.)  Her testimony is not inconsistent with her notes but merely adds greater detail.  This fact is deemed as admitted.

[11] Plaintiffs against dispute Nurse Hines's description of the timing of the baby's gasps for air, (Pls.' 56.1 ¶ 28), but do not point to contravening admissible evidence.  Nurse Hines's notes read in relevant part, "[i]nfant gasped 2-3 times while handling with ETT in place," (I.M.

tidal carbon dioxide detector posted positive results. (Hines's 56.1 ¶ 29 (citing I.M. ORMC Rec. 9).)[12]

Chest compressions were stopped after 90 seconds as the heart rate was rechecked and found to be in the 140s. (Hines's 56.1 ¶ 30 (citing I.M. ORMC Rec. 9).) Ventilation through the endotracheal tube continued and the baby's color improved with increasing heart rate and perfusion.[13] (*Id.* ¶ 31 (citing I.M. ORMC Rec. 9).) Apgar scores[14] were 1 at 1 minute (1 for heart rate less than 100 beats per minute); 3 at 5 minutes (2 for heart and 1 for color); 6 at 7 minutes (2 for heart rate, 1 for respiration, 1 for tone, and 2 for color); and 8 at 10 minutes (2 for heart rate, 2 for respiration, 2 for color, 1 for tone, and 1 for reflex). (Pls.' 56.1 ¶ 32.) The pH values of the blood specimens taken from the infant's umbilical cord were 7.087 from the umbilical cord artery and 7.239 from the umbilical cord vein. (*Id.* ¶ 33.)

---

ORMC Rec. 9), and she testified that this happened at approximately two minutes of life, (Hines Dep. 95.) Her testimony is not inconsistent with her notes but merely adds greater detail. This fact is deemed as admitted.

[12] Plaintiffs cite to part of Dr. Senguttuvan's 56.1 statement as contradicting evidence. (Pls.' 56.1 ¶ 29.) The statement reads, "[t]he infant-plaintiff was resuscitated within 20 seconds of life." (Senguttuvan's 56.1 ¶ 13 (citing Hines Dep. 89).) This statement, however, misquotes and misrepresents Nurse Hines's testimony. Nurse Hines testified that she intubated the baby at 20 seconds of life, not that the baby was resuscitated at 20 seconds of life. (Hines Dep. 89.) Plaintiffs' reliance on Dr. Senguttuvan's 56.1 statement at ¶ 13 to contravene several of Nurse Hines's statements is thus unavailing. This applies to Pls.' 56.1 ¶¶ 30–31.

[13] Perfusion is "the pumping of a fluid [such as blood] through an organ or tissue." Perfusion, Merriam-Webster's Online Dictionary, https://www.merriam-webster.com/medical/perfusion (last visited Nov. 29, 2018).

[14] An Apgar score is "an index used to evaluate the condition of a newborn infant based on a rating of 0, 1, or 2 for each of the five characteristics of color, heart rate, response to stimulation of the sole of the foot, muscle tone, and respiration with 10 being a perfect score." Apgar score, Merriam-Webster's Online Dictionary, https://www.merriam-webster.com/dictionary/Apgar%20score (last visited Nov. 29, 2018).

### 3. Care Provided in the NICU

I.M. was transferred to the Neonatal Intensive Care Unit ("NICU") for management at 10:15 a.m. or 10:16 a.m. (Pls.' 56.1 ¶ 34.) I.M. was transferred to the NICU with 100% FiO2[15] via endotracheal tube and Neo-T resuscitator with pressures of 20/5 and she showed good chest expansion. (*Id.* ¶ 35.) The baby's first vital signs were recorded by the nurses in the NICU at 10:16 a.m. (*Id.* ¶ 36.) Her blood pressure was 98/44 mmHg, her heart rate was 163 beats per minute, her temperature was 98 degrees Fahrenheit, and her blood oxygen saturation was 100%. (*Id.* ¶ 37.) A specimen of venous blood was collected at 10:15 a.m. from the infant's right arm for blood gas analysis and the results were available at 10:22 a.m. (Hines's 56.1 ¶ 38 (citing Hines Dep. 122; I.M. ORMC Rec. 33–34).)[16] The results from this analysis revealed a pH of 6.951, pCo2 (partial pressure of carbon dioxide) of 60.7, p02 (partial pressure of oxygen) of 88.8, and a base excess of -19.9. (Pls.' 56.1 ¶ 39.)

Portable chest and abdominal x-rays were ordered by Nurse Hines at 10:22 a.m. and were performed between l0:30 a.m. and l0:39 a.m. The results were available at 11:19 a.m. and

---

[15] FiO2 is an abbreviation for "fraction of inspired oxygen." FiO2, The Free Dictionary, https://medical-dictionary.thefreedictionary.com/Fio2 (last visited Nov. 29, 2018). Fraction of inspired oxygen is "[t]he concentration of oxygen in the inspired air, esp[ecially] that supplied as supplemental oxygen by mask or catheter." Fraction of inspired oxygen, The Free Dictionary, https://medical-dictionary.thefreedictionary.com/fraction+of+inspired+oxygen (last visited Nov. 29, 2018).

[16] Plaintiffs summarily deny "as to the time frame," (Pls.' 56.1 ¶ 38), but offer no contravening admissible evidence or explanation. The Court will not consider Plaintiffs' unsupported counterstatement. *See Raskin*, 125 F.3d at 66. The fact is therefore deemed admitted.

showed that the tip of the endotracheal tube was at the level of the clavicles.  (Hines's 56.1 ¶ 40 (citing I.M. ORMC Rec. 61).)[17]

A 10:50 a.m. note filed by Nurse Adrienne Quinn ("Nurse Quinn") at 11:16 a.m. reflects the baby had intermittent twitching in her lower extremities.  (Hines's 56.1 ¶ 41 (citing I.M. ORMC Rec. 13; Hines Dep. 135).)  The note reads in relevant part, "infant noted to open eyes but tone remains low & appears to have intermittent twitching in lower extremities."  (ORMC Rec. 13.)  Nurse Hines testified about the note, "Adrienne's note is at 10:50 a.m., but it wasn't filed until 11:16, so I can't tell from this exactly when that occurred."  (Hines Dep. 135.) Plaintiffs point out that Nurse Hines also testified that the twitching probably occurred before 10:50 a.m.  (Pls.' 56.1 ¶ 41 (citing Hines Dep. 133–34).)

Nurse Hines testified that she does not know when Dr. Senguttuvan was first called. (Hines Dep. 86.)[18]  Nurse Hines did not call Dr. Senguttuvan about the infant.  (Pls.' 56.1 ¶ 82.) Dr. Senguttuvan was not at the hospital when Nurse Hines was called to the operating room.  (*Id.* ¶ 83.)  Nurse Hines does not know when Dr. Senguttuvan arrived at the NICU.  (*Id.* ¶ 84.)

Dr. Senguttuvan is a neonatologist.  (Pls.' 56.1 ¶ 85.)  On March 6, 2015, Dr. Senguttuvan was the backup physician at ORMC assigned to Nurse Hines.  (Senguttuvan's 56.1

_____

[17] Plaintiffs reply to Hines's statement stating that they "[a]dmit that the 10:41 chest x-ray revealed that the endotracheal tube was at the clavicle and needed immediate adjustment," (Pls.' 56.1 ¶ 40), but point to no admissible evidence to support their assertion that the x-ray was taken at 10:41 a.m.  The Court will not consider Plaintiffs' unsupported counterstatement.  *See Raskin*, 125 F.3d at 66.  And the Court will not search the record to find evidence that Plaintiffs failed to bring to the Court's attention.  *Holtz*, 258 F.3d at 73.

[18] Plaintiffs deny this fact, stating that the "hospital record indicates that Dr. Senguttuvan was called soon after the baby was admitted, which, according to the hospital face sheet, was at 9:54," (Pls.' 56.1 ¶ 81), but do not cite any admissible evidence for their proposition.  The Court will not consider Plaintiffs' unsupported counterstatement.

¶¶ 24–25 (citing Rogers's Aff. Ex. K, at 29 (Dr. Senguttuvan's Deposition Transcript "Senguttuvan Dep.").)[19] Dr. Senguttuvan is Board Certified in Pediatrics and Neonatology. (Pls.' 56.1 ¶ 86.) In March 2015, Dr. Senguttuvan was an on-call neonatologist at ORMC. (*Id.* ¶ 87.) Dr. Senguttuvan testified that no neonatologist was present at ORMC on the morning of March 6, 2015 until she arrived. (Senguttuvan Dep. 38.) Dr. Senguttuvan further testified that Nurse Hines was the only neonatology nurse practitioner on the premises at ORMC the morning of I.M.'s delivery. (*Id.* at 42.) When a neonatologist is called in, one of her responsibilities is to assess the condition of the newborn, to identify any problems and to determine the cause of the problems. (Pls.' 56.1 ¶ 268.) When Dr. Senguttuvan arrived, she had authority to instruct Nurse Hines to do certain things as medically necessary. (*Id.* ¶ 269.) The nurse practitioners could look to Dr. Senguttuvan for guidance and instruction. (*Id.* ¶ 270.)

Whenever a baby was transferred from ORMC to a tertiary care center, a backup physician would be called in to assist with the transfer process. (Senguttuvan's 56.1 ¶ 32 (citing Senguttuvan Dep. 36–37).)[20] Dr. Senguttuvan testified that her role with the NICU team was to arrange for I.M.'s transfer to Westchester Medical Center ("WMC") for cooling. (Senguttuvan Dep. 52.)

Before Dr. Senguttuvan started working as an on-call neonatologist at ORMC, she had to provide documentation to and complete an interview with ORMC. (Senguttuvan Dep. 21–22.)

---

[19] Plaintiffs contest the description of Dr. Senguttuvan as a "backup physician" because Nurse Hines also testified that Dr. Senguttuvan supervised her. (Pls.' 56.1 ¶¶ 89–90.) The Court deems the fact that Dr. Senguttuvan was a supervising attending doctor on call as a "backup" as admitted. *See supra* n.7.

[20] Plaintiffs summarily deny several of Defendants' facts without explanation and without offering contravening admissible evidence. (Pls.' 56.1 ¶¶ 97, 98, 100, 101, 104, 105, 107, 108, 114, 115.) The Court will not consider Plaintiffs' unsupported counterstatements. *See supra* n.17.

Dr. Senguttuvan was given an orientation at ORMC in July 2011 when she started working there. (*Id*. at 25.)  At ORMC, Dr. Senguttuvan wore a security badge with her name and picture that said "Orange Regional Medical Center" on it.  (*Id*. at 61.)[21]

On the morning of March 6, 2015, Nurse Quinn called Dr. Senguttuvan and said that Nurse Hines had an intubated baby and needed Dr. Senguttuvan to come to the hospital.  (Pls.' 56.1 ¶¶ 91–93.)  Dr. Senguttuvan testified that she does not recall when exactly she received this call.  (Senguttuvan Dep. 32–33.)[22]  Dr. Senguttuvan did not receive any additional information between the telephone call and her arrival at ORMC.  (Pls.' 56.1 ¶ 95.)  I.M.'s treatment at ORMC had already begun before Dr. Senguttuvan arrived, (*id*. ¶ 88), and indeed, I.M. was already in the NICU when Dr. Senguttuvan arrived, (Senguttuvan Dep. 115).  Dr. Senguttuvan was not present at ORMC during I.M.'s resuscitation.  (*Id*. at 156.)

When Dr. Senguttuvan arrived at ORMC, she started to help with the process of transferring I.M. to WMC and completing the electronic process of orders.  (Senguttuvan Dep. 52.)  Dr. Senguttuvan's first entries into I.M.'s ORMC chart were timed at 10:49 a.m.  (Pls.' 56.1 ¶ 102.)  Dr. Senguttuvan's first note in the ORMC chart was timed at 10:50 a.m. and stated,

---

[21] ORMC and Nurse Bast deny numerous factual assertions with respect to Dr. Senguttuvan's work at ORMC, stating that Dr. Senguttuvan's cited testimony does not support her statements, (ORMC and Bast's 56.1 Counter ¶¶ 340–43), but it clearly does, nearly verbatim, (Pls.' 56.1 ¶¶ 89–90 (citing Senguttuvan Dep. 21–22, 25, 61).)  Defendants' 56.1 statement violates Local Civil Rule 56 because it "improperly interjects arguments and/or immaterial facts in response to facts asserted by [the] [plaintiff], without specifically controverting those facts . . . ."  *Pape*, 2013 WL 3929630, at *1 n.2.

[22] Plaintiffs admit this fact but inaccurately state that "Dr. Senguttuvan refused to testify what time she was called," (Pls.' 56.1 ¶¶ 91, 93), when in fact she stated that she did not recall the exact time.  (Senguttuvan Dep. 32–33.)  Plaintiffs' 56.1 statement violates Local Civil Rule 56 because it "improperly interjects arguments and/or immaterial facts in response to facts asserted by [the] [d]efendant, without specifically controverting those facts . . . ."  *Pape*, 2013 WL 3929630, at *1 n.2.

"Called for backup. Cord prolapse, 6.9 PH likely HIE." (*Id.* ¶ 103.) Dr. Senguttuvan testified that she arrived at ORMC sometime before 10:49 a.m. (*Id.* ¶ 276.)[23] Dr. Senguttuvan testified that she evaluated I.M.'s condition, including her hemodynamic stability and pH level. (*Id.* ¶ 271.) She prepared progress notes because she provided medical care and treatment to the patient. (*Id.* ¶ 272.)

### a. Sodium Bicarbonate and Phenobarbital Orders

At what time and by whom the sodium bicarbonate and phenobarbital were ordered and administered to I.M. is disputed. Nurse Hines and Dr. Senguttuvan were responsible for when the sodium bicarbonate and phenobarbital were given. (Pls.' 56.1 ¶ 221.) Nurse Hines, Dr. Senguttuvan, and the ORMC nurses were responsible for monitoring seizure activity in the baby, and for the placement of the endotracheal tube. (Hines Dep. 141–42.) Nurse Hines testified that she and Dr. Senguttuvan were also responsible for monitoring the ventilator settings, (*id.* at 140), and for the timely ordering of the phenobarbital, (Pls.' 56.1 ¶ 248).

Dr. Senguttuvan testified that she placed medication orders for I.M. to complete processes that had already been started. (Senguttuvan Dep. 52.) In particular, Dr. Senguttuvan placed orders into ORMC's computer to complete the "medication override" of events that had already happened. (*Id.* at 54.) A medication can be "overridden" and given before the physical act of placing an electronic order. (*Id.* at 104.) Cabinet overrides allow the nurses to retrieve

---

[23] Plaintiffs attempt to sow doubt about whether and why Dr. Senguttuvan was delayed in arriving at ORMC after receiving the call to come in, (Pls.' 56.1 ¶¶ 275, 277, 278–79), but do not support their assertions with admissible evidence; instead, they mischaracterize the record, and interject argument and conclusions not appropriate in a 56.1 statement. *See Rodriguez v. Schneider*, No. 95-CV-4083, 1999 WL 459813, at *1 n.3 (S.D.N.Y. Jun. 29, 1999) ("Rule 56.1 statements are not argument. They should contain factual assertions, with citation to the record. They should not contain conclusions . . . .")

medication from the cabinet. (*Id*. at 107.) After medication is retrieved by a nurse via a cabinet override, a regular order is entered to complete the electronic record. (*Id*. at 108.)

Dr. Senguttuvan testified that I.M.'s records include a cabinet override for sodium bicarbonate and phenobarbital, that this cabinet override occurred before she arrived at ORMC, and that her order for sodium bicarbonate and phenobarbital for I.M. served only to "complete electronic records." (*Id*. at 104.)

Two unsuccessful attempts were made to place a peripheral intravenous ("PIV") line by the nursing staff sometime before l0:50 a.m. (Pls.' 56.1 ¶ 42.) In her 56.1 statement, Nurse Hines states that "Dr. Senguttuvan ordered a sodium bicarbonate injection at 10:53 a.m. and it was administered at 11:04 a.m. after a normal saline bolus via UVC line [umbilical vessel catheter line]." (Hines's 56.1 ¶ 44 (citing I.M. ORMC Rec. 9, 13, 46).) Nurse Hines testified that Dr. Senguttuvan ordered the sodium bicarbonate at 10:53 a.m. because Nurse Hines was establishing the vascular access on the baby. (Hines Dep. 126.) Nurse Hines also testified that she was not sure when exactly the UVC line was first placed, but that the sodium bicarbonate was first given about 20 minutes after the UVC line was placed. She knew this because a saline bolus had to be administered via a UVC line before sodium bicarbonate could be administered, and a saline bolus takes about 20 minutes to administer. (*Id*. at 127–28.) I.M.'s chart includes a note that the UVC line was placed at 11:04 a.m., (I.M. ORMC Rec. 13), but Nurse Hines testified that the time of the note is not necessarily reflective of when the actual line was placed. (Hines Dep. 128.) Nurse Hines also testified that Phenobarbital was first administered at 11:58 a.m. (Hines's 56.1 ¶ 47 (citing I.M. ORMC Rec. 12); Hines Dep. 129.)

Dr. Senguttuvan's testimony that sodium bicarbonate and phenobarbital were administered before she arrived, and that she only entered a cabinet override, conflicts with

Nurse Hines's testimony that the sodium bicarbonate injection was administered at 11:04 a.m., and that the phenobarbital was first given at 11:58 a.m., both after Dr. Senguttuvan arrived. (Pls.' 56.1 ¶¶ 44, 109.)[24]

Plaintiffs incorrectly state that both Nurse Hines and Dr. Senguttuvan testified that "the standard of care was to administer sodium bicarbonate to treat acidosis." (Pls.' 56.1 ¶ 54.) In the portion of Nurse Hines's transcript Plaintiffs cite to, she did not testify that the "standard of care" is to administer sodium bicarbonate immediately—she testified that administering sodium bicarbonate is *one of the ways* acidosis may be treated, and emphasized that it is only appropriate once "you've obtained a blood gas [measure] that clinically indicates that bicarbonate . . . should be used." (Hines Dep. 38.) Dr. Senguttuvan also testified that administering sodium bicarbonate is "*one of the modalities*" of treating acidosis, and that if it is determined that a patient is acidotic, sodium bicarbonate should be administered immediately—she did not testify that administering sodium bicarbonate was the "standard of care." (Senguttuvan Dep. 97 (emphasis added).)[25]

Plaintiffs argue that "[d]ue to the failure to timely give sodium bicarbonate, the venous pH of 6.951 was worse than the cord pH taken at the time of birth of 7.239," (Pls.' 56.1 ¶ 224 (citing Hines Dep. 125)), but the portion of Nurse Hines's deposition transcript they cite to does

---

[24] Plaintiffs also cite to an ORMC's "root cause analysis" report which allegedly states that sodium bicarbonate was not administered until 11:30 a.m., (Pls.' 56.1 ¶¶ 44, 214), but this document has not been submitted to the Court as part of the record in this Action. The Court will not consider Plaintiffs' unsupported counterstatement. *See supra* n.17.

[25] Plaintiffs make numerous assertions in their 56.1 counterstatement, (Pls.' 56.1 ¶¶ 198–207), arguing that Dr. Danoff, Nurse Hines, and Dr. Senguttuvan's descriptions of the standard of care with respect to when sodium bicarbonate should be administered are the same—but for reasons explained above, and for reasons Defendants point out in their 56.1 counterstatements, (ORMC and Bast's 56.1 Counter ¶¶ 198–207; Hines's 56.1 Counter ¶¶ 198–207), that is simply not the case and misstates Nurse Hines and Dr. Senguttuvan's testimony.

not support their proposition. Nurse Hines testified that the pH change was caused by "acidosis from lactic acid that collects in the body" and that the cause of the lactic acidosis was that the baby was "depressed at birth." (Hines Dep. 125.)

Dr. Senguttuvan and Nurse Hines both testified that they are aware of the NRP guidelines. (*See* Senguttuvan Dep. 89, 92; Hines Dep. 17–19, 29, 90.) The sixth edition of the Neonatal Resuscitation Textbook was in effect on March 6, 2015, (Pls.' 56.1 ¶ 53), and reads in relevant part:

> The use of sodium bicarbonate during neonatal resuscitation is controversial. Its use may be helpful to correct metabolic acidosis that results from buildup of lactic acid that may occur while the baby has hypoxemia and poor cardiac output . . . sodium bicarbonate can be harmful, particularly if given too early in a resuscitation. Use of sodium bicarbonate may increase the serum pH but can worsen intracellular acidosis. You must be certain the ventilation of the lungs is adequate before administering sodium bicarbonate. When sodium bicarbonate mixes with acid, CO2 is formed. The lungs must be adequately ventilated to remove the CO2. If you decide to give sodium bicarbonate, remember that it is very hypertonic and irritating to blood vessels, and, therefore, must be given into a large vein, from which there is good blood return.

(Hines's 56.1 ¶ 54.) As noted in this quote, Defendants argue that Sodium bicarbonate can be dangerous and its use during neonatal resuscitation is controversial. (Senguttuvan's 56.1 ¶ 81– 82.) Indeed, Defendants argue that infusions of sodium bicarbonate are associated with increased mortality rates and increased intracranial hemorrhage in infants. (*Id.* ¶ 83.)

Regarding phenobarbital, Nurse Hines testified that if she were to observe seizures in a neonate, the standard of care would require her to order phenobarbital, but that she would not order phenobarbital prophylactically in the event that a baby was born depressed but had not yet had seizures because that was a decision the tertiary care center would make under its "cool-cap protocol." (Hines Dep. 44–45.) Nurse Hines also testified that twitching in a baby's lower

extremities is "possibly seizure activity," (*id*. at 134), but also noted that "[i]nfants can present [seizures] in a wide variety of ways that are typical to a newborn as opposed to an adult."[26]

Dr. Senguttuvan testified that abdominal movement and posturing can indicate that a baby is having a seizure. (Pls.' 56.1 ¶ 236.) Dr. Senguttuvan further testified that when seizures are diagnosed, the standard of care requires administration of phenobarbital to prevent excitation of the neuronal cells that can hurt cell inflammation in the brain. (*Id*. ¶ 237 (citing Senguttuvan Dep. 101).)[27] She further testified that it is not an accepted standard of care to give phenobarbital before the occurrence of seizures. (Senguttuvan Dep. 110.)

### b. Additional Testing and Adjustment of the Endotracheal Tube

Dr. Senguttuvan placed an order for an arterial blood gas specimen to be taken via arterial puncture. It was collected at 11:55 a.m. and results were available at 11:57 a.m. The results showed a pH of 7.545, a pC02 of 22.9, a p02 of 291.5, and a base excess of -1.2. (Pls.' 56.1 ¶ 45.)

A repeat portable chest x-ray was ordered by Nurse Hines at 11:44 a.m. It was performed between 11:50 a.m. and 12:06 p.m., and the results were available 12:21 p.m. The x-ray

---

[26] Plaintiffs make numerous additional unsupported counterstatements, and counterstatements that directly contradict the portions of testimony that they cite, with respect to whether I.M. exhibited seizure activity and what Nurse Hines and Dr. Senguttuvan said about I.M.'s seizure activity. (Pls.' 56.1 ¶¶ 238–45.) The Court will not consider Plaintiffs' unsupported counterstatements. *See supra* n.17.

[27] ORMC and Nurse Bast deny this fact, stating that the cited testimony does not support this statement, (ORMC and Bast's 56.1 Counter ¶ 237), but it clearly does, nearly verbatim, (Senguttuvan Dep. 101–02). ORMC and Nurse Bast also point the Court to Nurse Hines's testimony that "Oxygenation comes first" in treating a baby that is seizing, (ORMC and Bast's 56.1 Counter ¶ 237 (citing Hines Dep. 44–47)), which does not contradict Dr. Senguttuvan's testimony. This "improperly interjects arguments and/or immaterial facts in response to facts asserted by [the] [plaintiff], without specifically controverting those facts . . . ." *Pape*, 2013 WL 3929630, at *1 n.2.

revealed that the endotracheal tube had moved, and the tip was now further advanced in the carina.[28]  The NICU was aware of this and the tube was readjusted.  (*Id.* ¶ 46.)  When an endotracheal tube is placed, the tip should be just above the carina, and it should not be above the clavicle.  (*Id.* ¶¶ 249–51.)  Nurse Hines testified that the "optimal positioning" for the endotracheal tube "is between the clavicle and the carina," (Hines Dep. 143), and that if the endotracheal tube was seen to be at the level of the clavicles, it would be adjusted immediately, (*id.* at 144.)[29]

Dr. Senguttuvan testified that the whole NICU team, of which she was a part, was responsible for monitoring the vent settings and making sure they were appropriate, and for monitoring the endotracheal tube and making sure it is properly placed.  (Pls.' 56.1 ¶¶ 259–60.)

Nurse Hines testified that the second x-ray showed that the endotracheal tube was low in position and that there was "atelectasis on the right upper lobe."  (Hines Dep. 153–54.)[30] Atelectasis of the lungs may indicate that a portion of the lungs may not be expanded, or it could indicate an aspiration.  (*Id.* at 34.)  Nurse Hines testified that there was no way to tell what the cause of the atelectasis was, but she noted that I.M. had respiratory distress because she was

---

[28] The carina is "[a] cartilage situated at the point where the trachea (windpipe) divides into the two bronchi."  Carina, Oxford Dictionary Online, https://en.oxforddictionaries.com/definition/carina (last visited Nov. 29, 2018).

[29] Plaintiffs inaccurately characterize Nurse Hines's testimony as admitting that I.M.'s tube was improperly placed, (Pls.' 56.1 ¶¶ 252–53), but the portions of her testimony that they cite do not support this proposition.

[30] Atelectasis is a complete or partial collapse of the lung or area of the lung.  Atelectasis, Symptoms and Causes, The Mayo Clinic, https://www.mayoclinic.org/diseases-conditions/atelectasis/symptoms-causes/syc-20369684 (last visited December 10, 2018).

depressed at birth,[31] and that it was possible that the placement of the endotracheal tube caused the atelectasis. (*Id.* at 155–57.)[32]

At 12:11 p.m., Dr. Senguttuvan ordered the mechanical ventilation settings changed from 18/5 PIP over PEEP to a lower pressure of 16/5 PIP over PEEP, because I.M.'s pH was 7.54, which indicated she had alkalosis, and Dr. Senguttuvan wanted to correct the alkalosis. (Pls.' 56.1 ¶ 258.)

A third portable chest x-ray was ordered by Nurse Hines at 12:31 p.m., which was performed between 12:35 p.m. and 12:41 p.m., and revealed that the endotracheal tube had been withdrawn and the tip was now just below the level of the clavicles. (Hines's 56.1 ¶ 48 (citing I.M. ORMC Rec. 59).)[33]

### c. Discharge and Providers' Understanding of I.M.'s Condition

At 12:32 p.m., Nurse Hines ordered a left arm venous specimen be collected for repeat blood gas analysis. It was collected at 12:33 p.m. and results were available at 12:36 p.m. The

---

[31] The Parties fail to define almost all medical terms used in their filings, including "depressed at birth" or "depressed baby." The Court, although not required to, searched the record, and has not found a satisfactory definition. At best, Dr. DiCostanzo testified that a low Apgar score indicates that the baby was depressed, (DiCostanzo Dep. 244), and that the baby was depressed "[b]y the fact that it was not getting enough blood supply from the mother," (*id.* at 245). The Court was also unable to discern a conclusive definition from open sources because depressed at birth or depressed baby, refer to numerous conditions, including anything from neonatal respiratory depression to perinatal depression.

[32] The Court cites directly to the record because the Parties make semantic objections to each other's descriptions of the relevant testimony. (Hines's 56.1 Counter ¶¶ 254, 256; ORMC and Bast's 56.1 Counter ¶¶ 254, 256.)

[33] Plaintiffs deny this statement arguing it "ignores the fact that there was now atelectasis by the third chest x-ray caused by the failure to properly place the endotracheal tube," (Pls.' 56.1 ¶ 48), but fail to point to any admissible evidence in the record to support their contention. *See supra* n.17.

results showed a pH of 7.424, a pCo2 of 33.4, a p02 of 53.8, and a base excess of -2.2. (Pls.'
56.1 ¶ 49.)

The infant was discharged to WMC via helicopter transfer for "cool cap protocol" and
"tertiary care management" at 1:20 p.m. (*Id*. ¶ 50.)

Dr. Senguttuvan testified that from the time she arrived until I.M. was transferred, I.M.'s
care was managed by her, Nurse Hines, other nurses and respiratory therapists. (*Id*. ¶ 273.) Dr.
Senguttuvan testified that based on I.M.'s blood gases, she could not say exactly when, whether
during delivery or immediately prior to delivery, the baby suffered from impaired oxygen
exchange. (Senguttuvan Dep. 78–79.)[34]

---

[34] Plaintiffs state that I.M. was born with a pH of 7.087 based on the blood gases taken
from the umbilical cord and that this indicates acidosis. (Pls.' 56.1 ¶ 208 (citing Hines Dep. 36,
109; Senguttuvan Dep. 96).) Defendants correctly point out that the portions of testimony cited
do not support the proposition that I.M. was born with this pH, only that such a pH is consistent
with acidosis. (ORMC and Bast's 56.1 Counter ¶ 208; Hines's 56.1 Counter ¶ 208.) Plaintiffs
also state that the cord pH is indictive of impaired oxygen exchange during delivery or
immediately prior to delivery. (Pls.' 56.1 ¶ 209 (citing Senguttuvan Dep. 78–79).) But Plaintiffs
cite to a portion of Dr. Senguttuvan's testimony in which she expressly states that she cannot
conclusively say when the oxygen impairment occurred. (ORMC and Bast's 56.1 Counter
¶ 209; Hines's 56.1 Counter ¶ 209.)
    Plaintiffs also present as undisputed the fact that cord blood gas levels reveal the
oxygenation of the baby at or before birth, (Pls.' 56.1 ¶¶ 210–11), citing to the deposition
testimony of Defendants' experts Walter Molofsky, M.D. ("Dr. Molofsky") and Keith Eddleman,
M.D. ("Dr. Eddleman"). (*See* Letter from Jordan K. Merson, Esq., to Court (Dkt. No. 155)
attaching the deposition transcripts of Dr. Eddleman ("Eddleman Dep.") (Dkt. Nos. 155-1 – 155-
3) and Dr. Molofsky ("Molofsky Dep.") (Dkt. Nos.155-4 – 155-5).) Dr. Eddleman, however,
testified that cord blood gases determine a baby's *condition*, not its oxygenation levels, at birth.
(Eddleman Dep. 44 (emphasis added).) Dr. Molofsky did testify that cord blood gases provide
information about the baby's oxygenation at or immediately prior to birth, (Molofsky Dep. 46),
but the fact that cord blood gases may provide information about a baby's oxygenation does not
definitively prove that I.M.'s cord gas readings revealed what I.M.'s oxygenation and pH levels
were at birth.
    Plaintiffs make numerous additional unsupported counterstatements, and
counterstatements that contradict the portions of testimony that they cite, regarding I.M.'s pH
levels and whether they reflected her condition at birth. (Pls.' 56.1 ¶¶ 225–233.) The Court will
not consider Plaintiffs' unsupported counterstatements.

Nurse Hines testified that at the time of I.M.'s discharge, she believed that I.M.'s diagnosis was probably hypoxic ischemic encephalopathy ("HIE")[35] because she was a "depressed baby" who had metabolic acidosis. (Hines Dep. 163.)

Nurse Bast testified that she learned from the NICU team that the baby was transferred to WMC because she had brain damage, was starting to have seizures, and that they were hoping to institute cool-cap therapy. (Pls.' 56.1 ¶ 331.) Nurse Base testified that she never saw the baby but later learned by looking at the infant's charts that there was oxygen deprivation after the cord prolapse was diagnosed. (*Id.* ¶ 332.)

Dr. DiCostanzo testified that I.M. suffered a fetal bradycardia with the cord prolapse, (Pls.' 56.1 ¶ 326), and that based on I.M.'s charts it appears that for at least the first 10 minutes of life, I.M. suffered from depression, (*id.* ¶ 330). The Apgar score of 1 at 1 minute indicated that there was some sort of incident where the baby was depressed from the cord prolapse, as the baby was not getting enough blood supply from the mother to the brain. (*Id.* ¶ 327.) Dr. DiCostanzo also testified that she later learned as part of the lawsuit that I.M. suffered from HIE. (*Id.* ¶ 329; DiCostanzo Dep. 254–55.)

### 4. Expert Reports

The Parties have submitted numerous expert reports. Only the qualifications of Plaintiffs' experts are at issue and therefore the Court will only discuss their qualifications and testimony at length.

---

[35] HIE is a "type of brain damage that occurs when an infant's brain doesn't receive enough oxygen and blood." Infant Hypoxic Ischemic Encephalopathy (HIE), Birth Injury Guide, https://www.birthinjuryguide.org/birth-injury/types/hypoxic-ischemic-encephalopathy-hie/ (last visited Dec. 2, 2018). "(HIE) is a neonatal birth injury caused by oxygen deprivation and limited blood flow to the baby's brain at or near the time of birth." What is HIE?, HIE Help Center, https://hiehelpcenter.org/what-is-hypoxic-ischemic-encephalopathy/#definition (last visited Dec. 3, 2018).

### a. Dr. Danoff

Plaintiffs served an expert report from Stuart Danoff, M.D. ("Dr. Danoff"), a pediatrician and neonatologist. Dr. Danoff stated that he is board certified in pediatrics and has practiced pediatrics and neonatal medicine for over 50 years. Dr. Danoff stated that he is licensed to practice medicine in New York and Connecticut. He received a bio-chemistry degree from Harvard College and a medical degree from New York University. (Decl. of Jordan K. Merson, Esq. ("Merson Decl.") Ex. 14, at 2, 5 (Dr. Danoff's Affidavit and Expert Report ("Danoff Expert Rep.") (Dkt. No. 136).)[36] Dr. Danoff completed a fellowship in neonatal medicine at Columbia University Medical School in 1983 and served as the chief of neonatal medicine at Norwalk Hospital in Connecticut from 1983 until 2004. During that time he was an attending neonatologist at Columbia Presbyterian Hospital's NICU. (Danoff Expert Rep. 5.) Dr. Danoff stated that he is an instructor in neonatal resuscitation, a program developed by the American Academy of Pediatrics and the American Academy of Anesthesiology and Obstetrics and Gynecology. Dr. Danoff also stated that he was hired as a consultant to the department of health of the State of Connecticut in 2010. (Danoff Expert Rep. 6.)[37] Over the course of his career, he

---

[36] For non-paginated exhibits, the Court cites to the ECF-generated page numbers at the top right corner of the relevant page.

[37] In their reply memoranda Nurse Hines and Dr. Senguttuvan challenge Dr. Danoff's credentials. (Hines Reply 3; Senguttuvan Reply 6–7.) Dr. Senguttuvan goes as far as accusing Dr. Danoff of fabricating and manufacturing his credentials. The Court only briefly addresses these allegations. Upon review of the evidence submitted by Dr. Senguttuvan, most of which is likely not admissible or dispositive in any event, the Court finds that the neonatal Defendants have failed to prove Dr. Danoff fabricated his credentials.
    Nurse Hines and Dr. Senguttuvan challenge Dr. Danoff's assertion that he is an instructor in neonatal resuscitation. (Hines Reply 3; Senguttuvan Reply 7.) Andrew M. Steele, M.D. ("Dr. Steele"), an expert for Dr. Senguttuvan, stated in his expert letter that "there is no such program developed by the American Academy of Pediatrics and the American Academy of Anesthesiology and Obstetrics and Gynecology." (Rogers's Aff. Ex. N., at 4 ("Steele Expert Rep.").) Dr. Senguttuvan submitted an email from an official at the American Academy of

Pediatrics stating that the official was unable to locate a record for Dr. Danoff within the "current NRP Learning Management System." (Leifert Reply Decl. Ex. E ("DePauw Email").) Admissibility concerns aside, this email does not prove that Dr. Danoff was never an instructor with the organization, nor that he was not an instructor with some other organization and made an honest mistake in describing his credentials. "Constru[ing] the facts in the light most favorable to the non-moving party," *Brod*, 653 F.3d at 164, the Court will consider Dr. Danoff's sworn biographical statement that he was or is an instructor of neonatal resuscitation.

Dr. Senguttuvan also challenges Dr. Danoff's claim that he was a consultant for the State of Connecticut. She submitted an email exchange with an official from the Connecticut Department of Health, in which the official explains that the department "maintain[s] a list of interested consultants for various professions and specialties" and spells out the criteria a consultant must meet. The official confirmed that Dr. Danoff reviewed one case for the state in 2014. (Leifert Reply Decl. Ex. A ("Montauti Email").) Once more, setting aside admissibility concerns, this email does not prove that Dr. Danoff was never a consultant for the State of Connecticut—quite the opposite. Aside from the discrepancy in Dr. Danoff stating that he was a consultant in 2010, and the official stating he was a consultant in 2014, which could be explained by an honest mistake on Dr. Danoff's part, the Court does not see the inaccuracy in Dr. Danoff's assertion, and certainly does not see it as a fabrication.

 Dr. Senguttuvan next attacks Dr. Danoff's claim that he is registered to practice medicine in the State of New York. Dr. Senguttuvan submitted a screenshot of a web search of the New York State Education Department's ("NYSED") Office of the Profession website showing that Dr. Danoff is not currently registered to practice medicine in the State of New York. (Leifert Reply Decl. Ex. B ("NYSED Search").) Dr. Senguttuvan offers no explanation as to why the Court should consider this web search as proof of Dr. Danoff's registration status—she does not explain what the searched database is, she does not explain whether the NYSED is the body that keeps medical licensing records, she does not explain whether there are any other organizations that maintain medical licensing records, and she provides no information about how this web search was conducted, or whether the official who responded has the authority to make the representations made. Moreover, Plaintiffs submitted, albeit in a surreply that they did not seek the Court's permission to file, Dr. Danoff's registration certificate to practice medicine in the State of New York which was valid through March 31, 2018. (*See* September 18, 2018 Letter from Jordan Merson, Esq., to Court (Dkt. No. 153).) Dr. Danoff's expert report is dated January 22, 2018, meaning he was licensed to practice medicine in New York on the date he submitted his expert report.

The Court agrees that it does not help Dr. Danoff's credibility that his affidavit is dated August 20, 2018, and that in that affidavit he states he *is* licensed to practice medicine in New York, (*see* Danoff Expert Rep. 2), when the New York registration certificate he submitted was only valid through March 31, 2018. However, "district courts may not weigh evidence or assess the credibility of witnesses at the summary judgment stage." *Jeffreys v. City of New York*, 426 F.3d 549, 551 (2d Cir. 2005); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986) (noting that at the summary judgment stage, the court is not to "weigh the evidence and determine the truth of the matter"). Therefore, "constru[ing] the facts in the light most favorable to the non-moving party," *Brod*, 653 F.3d at 164, the Court accepts that Dr. Danoff was registered to practice medicine in the State of New York at the time he submitted his expert

has managed "thousands of neonatal cases, including hundreds of cases of neonatal hypoxia, metabolic and respiratory acidosis." (*Id*.)

Dr. Danoff retired as an active practitioner in 2004. (Pls.' 56.1 ¶ 55.)[38] Dr. Danoff sometimes still makes rounds at the NICU at Columbia Presbyterian Hospital as a visiting neonatologist. At the time of his deposition on February 21, 2018, the last time that he did so was in the fall of 2017 before Thanksgiving. (*Id*. ¶ 56.) Dr. Danoff has not taken any Continuing Medical Education courses in the last 15 years. (*Id*. ¶¶ 57, 120.) Dr. Danoff does not subscribe to any medical journals and the last time he did so was over five years ago. (*Id*. ¶¶ 58, 122, 123.) Dr. Danoff receives a publication entitled "Pediatrics" as he is a member of the American Academy of Pediatrics, but he does not remember the last time that he received a copy. (*Id*. ¶¶ 59, 124.) He occasionally reads it. (*Id*. ¶ 60.) Dr. Danoff relies on the Neonatal Resuscitation textbook, "which is an authoritative textbook as far as [he is] concerned." (Hines's 56.1 ¶ 62 (citing Rogers's Aff. Ex. H, at 135–36 (Dr. Danoff's Deposition Transcript ("Danoff

---

report and at least up through March 31, 2018, and that he is still licensed to practice in Connecticut, as no Party has contested his Connecticut registration status.

Finally, Dr. Senguttuvan submitted several other screenshots of web searches related to Dr. Danoff's credentials, including a search of the Norwalk Hospital's website, the New York-Presbyterian's website, and the American Board of Pediatrics website. (*See generally* Leifert Reply Decl.) The Court will not address these documents at length other than to say that, like the submissions discussed above, they are likely not admissible, do not prove Dr. Danoff manufactured his credentials, and are not dispositive because the Court need not rely on the portions of Dr. Danoff's resume that Dr. Senguttuvan is contesting to decide whether he is qualified.

[38] Plaintiffs admit this statement but add additional biographical information about Dr. Danoff that they do not support with any admissible evidence. The Court will not consider Plaintiffs' unsupported counterstatement. Curiously, Plaintiffs deny this claim at Pls.' 56.1 ¶¶ 117–18, despite admitting it at Pls.' 56.1 ¶ 55, and despite the fact that Dr. Danoff testified, "I retired as an active practitioner in 2004," (Rogers's Aff. Ex. H, at 9 (Dr. Danoff's Deposition Transcript ("Danoff Dep.").) Plaintiffs attempt to interject unsupported biographical evidence about Dr. Danoff repeatedly in their 56.1 counterstatement. (Pls.' 56.1 ¶¶ 56–58, 64, 120, 122–23.)

Dep.")).)[39]  Dr. Danoff testified that he did not have "the slightest idea what the latest edition" of the Neonatal Resuscitation textbook is.  (Pls.' 56.1 ¶ 63.)  Dr. Danoff was never board certified in neonatal-perinatal medicine.  (*Id*. ¶ 64.)  Dr. Danoff keeps current only by making rounds at Columbia Presbyterian Hospital, and also by talking to students, fellows, residents and other neonatologists.  (*Id*. ¶¶ 128–29.)  He has testified once as an expert witness in the last 5 years.  (*Id*. ¶ 61.)

Dr. Danoff has not authored any publications in the fields of pediatrics or neonatology since 1995, (*id*. ¶¶ 65, 127), nor has he authored any publication regarding neonatal care in the face of an umbilical cord prolapse, (*id*. ¶ 126).  Dr. Danoff had never before heard or read that it is dangerous to give a neonate sodium bicarbonate without first administering saline because of the deleterious effects that it has on the infant's brain and heart and that it can cause cerebral hemorrhage.  (*Id*. ¶ 143.)[40]  Dr. Danoff is unfamiliar with research which formed the basis for a 10-year old article titled "Sodium bicarbonate, basically useless therapy."  (*Id*. ¶ 144.)[41]

---

[39] Plaintiffs summarily, and somewhat confusingly, deny this statement arguing "defendants [are trying] to advance a theory that conflicts with the testimony of defendants themselves."  (Pls.' 56.1 ¶ 62.)  The Court will not consider Plaintiffs' unsupported counterstatement.

[40] Plaintiffs admit this statement but interject the inaccurate and irrelevant argument that Nurse Hines and Dr. Senguttuvan were also not aware of this fact.  (Pls.' 56.1 ¶ 143 (citing Hines Dep. 38; Senguttuvan Dep. 97).)  First, the portions of transcript to which Plaintiffs cite do not support Plaintiffs' proposition.  Neither Nurse Hines nor Dr. Senguttuvan was expressly asked about or discussed their awareness of the dangers of administering sodium bicarbonate.  If anything, Nurse Hines testified that sodium bicarbonate should only be administered once the baby's blood gas indicated it is safe to do so.  (Hines Dep. 38.)  Second, Defendants do not seek to qualify Nurse Hines nor Dr. Senguttuvan as experts—their awareness of the standard of care and expertise has an altogether different significance than that of Dr. Danoff.

[41] Plaintiffs admit this statement but again interject the inaccurate and irrelevant argument that Nurse Hines and Dr. Senguttuvan were also not aware of this article.  (Pls.' 56.1 ¶ 144 (citing Hines Dep. 38; Senguttuvan Dep. 97).)  The portions of transcript Plaintiffs cite make no mention of the article in question.

Doctor Danoff reviewed the ORMC medical records pertaining to Ms. Hartmann and to I.M., Plaintiffs' medical records from WMC, Good Shephard Rehabilitation Hospital (GSRH), MCHC, Luger Scranton Rehabilitation Center, Ms. Hartmann's interrogatory responses and deposition transcript, the deposition transcripts of Nurse Hines, Dr. Senguttuvan, and the expert reports of Dr. Hamar and Dr. Steele. (Danoff Expert Rep. 2.) However, Dr. Danoff did not review I.M.'s x-ray films. (Pls.' 56.1 ¶ 169.) The opinions in his expert report are based on his "training, experience, and education," and his review of these materials. (Danoff Expert Rep. 2.)

Dr. Danoff concluded that the main deviations from the standard of care were the untimely administration of sodium bicarbonate in the face of severe acidosis, untimely administration of phenobarbital for convulsions, and improper administration of ventilatory care. (Pls.' 56.1 ¶ 136.) First, Dr. Danoff opined that I.M.'s low cord pH and that she was floppy and bradycardic and cyanotic at birth, indicated that she had severe acidosis and that sodium bicarbonate would be needed to treat her. (Dr. Danoff Ex. Rep. 7.) He opined that "it was incumbent upon the neonatal staff to immediately and without delay suction the meconium from the trachea and provide adequate ventilation and respiratory and vascular support to maintain proper oxygenation and cardiovascular circulation" and to immediately administer sodium bicarbonate. (*Id*.) Dr. Danoff points out that I.M. was born at 9:54 a.m., the sodium bicarbonate was not ordered until an hour later at 10:53 a.m., and not administered until 11:04 a.m. He opined that such a delay was a deviation from the standard of care. (*Id*. at 8.) Second, Dr. Danoff opined that the endotracheal tube was not properly placed as evidenced by the x-ray which revealed it was too high in the trachea and that this caused I.M. to experience further hypoxia. He pointed to I.M.'s lower pH an hour after intubation as evidence that she was not properly intubated. (*Id*.) Third, Dr. Danoff opined that the twitching I.M. exhibited at

10:50 a.m. was seizure activity and that phenobarbital should have been administered immediately. Instead, phenobarbital was not given until 11:58 a.m., an hour after the twitching began. (*Id*. at 9.) Dr. Danoff concludes that these deviations were the direct cause of persistent acidosis and significant hypoxic brain damage, and HIE resulting in permanent and irreversible neurological abnormalities. (Pls.' 56.1 ¶ 190.)

Dr. Danoff also opined that I.M. was "dead" at the moment of birth, (Danoff Dep. 76, 84, 122), and that there was no doubt that I.M. suffered irreversible brain damage before she was delivered, (Pls.' 56.1 ¶¶ 161–62). Dr. Danoff had no criticism of the size of the endotracheal tube used, stating that a 3.5 endotracheal tube is adequate, and a 4.0 endotracheal tube is "great." (Pls.' 56.1 ¶¶ 170–72.) Based on the Apgar score readings in I.M.'s chart, Dr. Danoff testified that "I don't think the baby breathed for the first, I mean really breathed, for seven minutes." (Danoff Dep. 167–68).

### b. Dr. Hamar

Plaintiffs also served an expert report from Benjamin Hamar, M.D. ("Dr. Hamar"). (Pls.' 56.1 ¶¶ 188, 280–85.) Dr. Hamar is a board-certified obstetrician and gynecologist. He currently practices at Beth Israel-Deaconess Medical Center ("BIDMC"), where he is the Director for the Center for Maternal-Fetal Health, Beverly Hospital, and Mount Auburn Hospital, and is an Assistant Professor at Harvard Medical School. (Brayer Decl. Ex. N., at 2–3 ("Hamar Expert Rep.").)

In his report, Dr. Hamar opined that Ms. Hartmann's cord prolapse was negligently managed by her providers. Dr. Hamar opined that Dr. DiCostanzo deviated from the standard of care by removing her hand from Ms. Hartmann's vagina too early so that she was no longer elevating the baby's head, and that this led the cord to drop below the baby's head, further

depriving her of oxygen. (*Id*. at 4–5.) Specifically, Dr. Hamar also opined that having Ms. Hartmann push before she was fully dilated was dangerous and a "clear violation in the standard of care and led to delays in the delivery with resulting worsening of the hypoxia and acidosis." (*Id*. at 5.) Dr. Hartman also opined that Ms. Hartmann's providers failed to properly monitor the fetus, for example by not checking her heart rate, from the time that the prolapse was identified to the time of delivery. (*Id*.)

Dr. Hamar also opined that Ms. Hartmann's providers failed to timely deliver the infant. He stated that a cord prolapse is a true obstetric emergency and the infant must be delivered as fast as possible. Although he acknowledged the recommendation by the American College of Obstetricians and Gynecologists ("ACOG") that the decision to incision time should be 30 minutes or less for emergency cesarean deliveries, he opined that ACOG has backed away from the "30-minute rule" in its more recent publications. Dr. Hamar opined that in this case involving a cord prolapse, the decision to incision time should have been less than 10 minutes. (Pls.' 56.1 ¶ 189.) Dr. Hamar points out that it took fourteen minutes from diagnosis to get Ms. Hartmann to the operating room, and another ten minutes for anesthesia to be administered. (Hamar Expert Rep. 7–8.)

Dr. Hamar also describes I.M.'s subsequent medical history in his report. He states that the diagnoses in the WMC chart included perinatal depression and the pediatric endocrinology consult note documents "birth asphyxia [secondary] to prolapse cord." (Pls.' 56.1 ¶¶ 334 (citing Hamar Expert Rep. 9).)[42] He states that further testing on March 9 and 12, 2015 confirmed

---

[42] ORMC and Nurse Bast dispute the description of I.M.'s subsequent medical history, because they claim that Plaintiffs failed to cite to admissible evidence. (ORMC and Bast's 56.1 Counter ¶¶ 334–38.) ORMC and Nurse Bast do not object to some of Plaintiffs' other citations to Dr. Hamar's expert report because those portions cite to admissible evidence, such as portions of the transcript. The disputed portions of the report do not cite to evidence that has been

continued seizure activity and I.M. was subsequently admitted to GSRH from August 10, 2015 to October 29, 2015 with the diagnoses of non-traumatic brain injury, global developmental delays, and spasticity. The stated reason for admissions was that I.M. was born "via STAT C-section for a prolapsed cord resulting in hypoxic ischemic encephalopathy and required head cooling." Dr. Hamar states that I.M. has subsequently been diagnosed with global developmental delays, cerebral palsy, muscle weakness, feeding difficulties, and dysphagia and continues to have a gastronomy tube. (*Id.* ¶¶ 335–38 (citing Hamar Expert Rep. 9).)

B. Procedural History

Plaintiffs filed the Complaint on September 30, 2016. (Compl. (Dkt. No. 1).) Dr. Kothari filed an Answer on November 15, 2016. (Kothari Answer (Dkt. No. 30).) ORMC filed an Answer on November 16, 2016. (ORMC Answer (Dkt. No. 36).) Nurse Bast filed an Answer on November 16, 2016. (Bast Answer (Dkt. No. 38).) Nurse Hines filed an Answer on November 18, 2016. (Hines Answer (Dkt. No. 51).) Dr. Senguttuvan filed an Answer on

_____

submitted to this Court as part of the briefing on the present Motions. Dr. Hamar cites to I.M.'s GSRH medical chart, and I.M.'s subsequent diagnoses and medical records—none of which Plaintiffs have submitted to the Court. However, although a district court may only consider admissible evidence at the summary judgment stage, "a plaintiff need not introduce evidence in a form that would be admissible at trial in order to survive a motion for summary judgment." *Murphy v. Metropolitan Transp. Auth.*, 548 F. Supp. 2d 29, 42 (S.D.N.Y. 2008) (*citing Celotex v. Catrett*, 477 U.S. 317, 324 (1986) ("We do not mean that the nonmoving party must produce evidence in a form that would be admissible at trial in order to avoid summary judgment.").) "[W]hen the evidence offered in opposition to a motion . . . for summary judgment is defective in form but is sufficient to apprise the court that there is important and relevant information that could be proffered to defeat the motion, summary judgment ought not to be entered." *Liberty Mut. Ins. Co. v. Rotches Pork Packers, Inc.*, 969 F.2d 1384, 1389 (2d Cir. 1992) (alterations and internal quotation marks omitted). Dr. Hamar's expert report apprises the Court of the existence of the WMC and GSRH medical charts, and of I.M.'s subsequent diagnoses—which are relevant to assessing the injuries Plaintiffs allegedly suffered. No Party has argued that Dr. Hamar's description of I.M.'s subsequent medical history is inaccurate, and Nurse Hines does not dispute these facts in her 56.1 counterstatement. (Hines's 56.1 Counter ¶¶ 334–38.) The Court will thus consider Dr. Hamar's descriptions of I.M.'s subsequent medical history at this stage.

December 2, 2016.  (Senguttuvan Answer (Dkt. No. 59).)  The United States filed an Answer on January 13, 2017.  (United States Answer (Dkt. No. 71).)

On January 18, 2017, the Parties agreed by stipulation to dismiss certain individual Defendants and claims from this Action without prejudice because those individuals were employees of the United States and the exclusive remedy for their alleged negligent acts is an FTCA suit against the United States.  (Stipulation (Dkt. No. 72).)

On May 4, 2017, the Court held an initial pre-trial conference, (*see* Dkt. (minute entry for May 4, 2017)), and issued a Case Management and Scheduling Order, (Dkt. No. 80).  On May 5, 2017, the case was referred to a Magistrate Judge for general pretrial management.  (Dkt. No. 81.)  The Court granted the Parties' requests for discovery deadline extensions several times, (*see* Dkt. Nos. 87, 91), but noted on February 26, 2018, that no more extensions would be granted, (Dkt. No. 95).

On April 13, 2018, counsel for Dr. Senguttuvan submitted a pre-motion letter to the Court requesting permission to file a Motion for Summary Judgment.  (*See* Letter from John L. Leifert, Esq., to Court (Dkt. No. 97).)  On April 17, 2018, counsel for Plaintiffs submitted a letter opposing Dr. Senguttuvan's request.  (*See* Letter from Jordan Merson, Esq., to Court (Dkt. No. 98).)  On April 26, 2018, counsel for Nurse Hines submitted a pre-motion letter to the Court requesting permission to file a Motion for Summary Judgment.  (*See* Letter from Christopher T. Rogers, Esq., to Court (Dkt. No. 102).)  On April 30, 2018, counsel for Plaintiffs submitted a letter opposing Nurse Hines's request.  (*See* Letter from Jordan Merson, Esq., to Court (Dkt. No. 103).)  On May 8, 2018, counsel for ORMC and Nurse Bast submitted a pre-motion letter to the Court requesting permission to file a Motion for Summary Judgment.  (*See* Letter from Jayne L. Brayer, Esq., to Court (Dkt. No. 106).)  On May 8, 2018, counsel for Plaintiffs submitted a letter

opposing ORMC and Nurse Bast's request.  (*See* Letter from Jordan Merson, Esq., to Court (Dkt. No. 107).)  On May 17, 2018, the Court held a pre-motion conference, (*see* Dkt. (minute entry for May 17, 2018)), and issued a Motion Scheduling Order, (Dkt. No. 108).

On July 20, 2018, Nurse Hines filed her Motion for Summary Judgment, accompanying papers and exhibits, and a Rule 56.1 statement.  (Hines's Not. of Mot.; Aff. of Christopher Rogers Aff.; Hines's Mem. of Law. in Supp. of Mot. for Summ. J. ("Hines's Mem.") (Dkt. No. 113); Hines's 56.1.)  On July 20, 2018, ORMC and Nurse Bast submitted their Motion for Summary Judgment, and due to a filing error, on July 31, 2018, they belatedly filed their accompanying papers and exhibits, and a Rule 56.1 statement.  (ORMC and Bast's Not. of Mot.; Brayer Decl.; ORMC and Bast's Mem. of Law. in Supp. of Mot. for Summ. J. ("ORMC and Bast's Mem.") (Dkt. No. 121); ORMC and Bast's 56.1.)  On July 31, 2018, Dr. Senguttuvan submitted her Motion for Summary Judgment, accompanying papers and exhibits, and a Rule 56.1 statement.  (Senguttuvan's Not. of Mot.; Decl. of John L. Leifert, Esq. ("Leifert Decl.") (Dkt. No. 125); Senguttuvan's Mem. of Law. in Supp. of Mot. for Summ. J. ("Senguttuvan's Mem.") (Dkt. No. 126); Senguttuvan's 56.1.)

On August 20, 2018, Plaintiffs filed their Opposition to the Motion with the accompanying memorandum of law, a response to Defendants' Rule 56.1 statements, and exhibits.  (Merson Decl.; Pls.' 56.1; Pls.' Mem. in Oppn. to Mot. for Summ. J. ("Pls.' Mem.") (Dkt. 138).)

On September 7, 2018, counsel for ORMC and Nurse Bast filed a reply and a Rule 56.1 counterstatement.  (ORMC and Bast's Reply Mem. of Law in Further Supp. of Mot. for Summ. J. ("ORMC and Bast's Reply") (Dkt. No. 140); ORMC and Bast's 56.1 Counter.)  On September 10, 2018, counsel for Nurse Hines filed a reply and a Rule 56.1 counterstatement.  (Hines's

Reply Mem. of Law in Further Supp. of Mot. for Summ. J. ("Hines's Reply") (Dkt. No. 143);

Decl. of Christopher Rogers, Esq. ("Rogers Decl.") (Dkt. No. 144); Hines's 56.1 Counter.) On

September 13, 2018, counsel for Senguttuvan filed a reply and a reply declaration with further

exhibits. (Senguttuvan's Reply Mem. of Law in Further Supp. of Mot. for Summ. J.

("Senguttuvan's Reply") (Dkt. No. 150); Decl. of John L. Leifert, Esq. ("Leifert Reply Decl.")

(Dkt. No. 151).) The Motions were thus fully briefed on September 13, 2018.

On September 18, 2018, in response to allegations about Dr. Danoff's credentials,

counsel for Plaintiffs filed a letter attaching Dr. Danoff's license to practice medicine in New

York. (*See* Letter from Jordan Merson, Esq., to Court (Dkt. No. 153).) On December 4, 2018,

Plaintiffs belatedly filed transcripts cited in their 56.1 counterstatement. (Dkt. No. 155.)

## II. Discussion

### A. Standard of Review

Summary judgment is appropriate where the movant shows that "there is no genuine

dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.

R. Civ. P. 56(a); *see also Psihoyos v. John Wiley & Sons, Inc.*, 748 F.3d 120, 123–24 (2d Cir.

2014) (same). "In determining whether summary judgment is appropriate," a court must

"construe the facts in the light most favorable to the non-moving party and . . . resolve all

ambiguities and draw all reasonable inferences against the movant." *Brod*, 653 F.3d at 164

(internal quotation marks omitted); *see also Borough of Upper Saddle River v. Rockland Cty.

Sewer Dist. No. 1*, 16 F. Supp. 3d 294, 314 (S.D.N.Y. 2014) (same). "It is the movant's burden

to show that no genuine factual dispute exists." *Vt. Teddy Bear Co. v. 1-800 Beargram Co.*, 373

F.3d 241, 244 (2d Cir. 2004); *see also Berry v. Marchinkowski*, 137 F. Supp. 3d 495, 521

(S.D.N.Y. 2015) (same).

"However, when the burden of proof at trial would fall on the nonmoving party, it ordinarily is sufficient for the movant to point to a lack of evidence to go to the trier of fact on an essential element of the nonmovant's claim," in which case "the nonmoving party must come forward with admissible evidence sufficient to raise a genuine issue of fact for trial in order to avoid summary judgment." *CILP Assocs., L.P. v. Pricewaterhouse Coopers LLP*, 735 F.3d 114, 123 (2d Cir. 2013) (alteration and internal quotation marks omitted). Further, "[t]o survive a [summary judgment] motion . . . , [a nonmovant] need[s] to create more than a 'metaphysical' possibility that his allegations were correct; [s]he need[s] to 'come forward with specific facts showing that there is a genuine issue for trial,'" *Wrobel v. County of Erie*, 692 F.3d 22, 30 (2d Cir. 2012) (emphasis omitted) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986)), "and cannot rely on the mere allegations or denials contained in the pleadings," *Guardian Life Ins. Co. v. Gilmore*, 45 F. Supp. 3d 310, 322 (S.D.N.Y. 2014) (internal quotation marks omitted); *see also Wright v. Goord*, 554 F.3d 255, 266 (2d Cir. 2009) ("When a motion for summary judgment is properly supported by documents or other evidentiary materials, the party opposing summary judgment may not merely rest on the allegations or denials of his pleading . . . .").

"On a motion for summary judgment, a fact is material if it might affect the outcome of the suit under the governing law." *Royal Crown Day Care LLC v. Dep't of Health & Mental Hygiene*, 746 F.3d 538, 544 (2d Cir. 2014) (internal quotation marks omitted). At this stage, "[t]he role of the court is not to resolve disputed issues of fact but to assess whether there are any factual issues to be tried." *Brod*, 653 F.3d at 164 (internal quotation marks omitted). Thus, a court's goal should be "to isolate and dispose of factually unsupported claims." *Geneva Pharm. Tech. Corp. v. Barr Labs. Inc.*, 386 F.3d 485, 495 (2d Cir. 2004) (internal quotation marks

omitted) (quoting *Celotex*, 477 U.S. at 323–24). However, a district court should consider only evidence that would be admissible at trial. *See Nora Beverages, Inc. v. Perrier Grp. of Am., Inc.*, 164 F.3d 736, 746 (2d Cir. 1998). "[W]here a party relies on affidavits . . . to establish facts, the statements 'must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant . . . is competent to testify on the matters stated.'" *DiStiso v. Cook*, 691 F.3d 226, 230 (2d Cir. 2012) (quoting Fed. R. Civ. P. 56(c)(4)).

### B. Analysis

#### 1. Medical Malpractice

"To establish a claim for medical malpractice under New York law, a plaintiff must prove (1) that the defendant breached the standard of care in the community, and (2) that the breach proximately caused the plaintiff's injuries." *Lettman v. United States*, No. 12-CV-6696, 2013 WL 4618301, at *3 (S.D.N.Y. Aug. 29, 2013) (quoting *Arkin v. Gittleson*, 32 F.3d 658, 664 (2d Cir. 1994)).

##### a. Neonatal Defendants

The neonatal Defendants' principal argument on summary judgment is that Dr. Danoff, Plaintiffs' proposed neonatology expert, is not qualified to opine as an expert witness and that his expert report is unreliable and should be found inadmissible under Rule 702 of the Federal Rules of Evidence. The neonatal Defendants further argue that Plaintiffs cannot prevail on their medical malpractice claim without an expert opinion. (Hines Mem. 4–19; Senguttuvan Mem. 1–7.)

"Expert testimony is normally required to establish the applicable standard of practice and, in an appropriate case, to determine whether an alleged deviation from that standard was the proximate cause of a plaintiff's injuries." *Berk v. St. Vincent's Hosp. & Med. Ctr.*, 380 F. Supp.

2d 334, 343 (S.D.N.Y. 2005). "It is well established in New York law that 'unless the alleged

act of malpractice falls within the competence of a lay jury to evaluate, it is incumbent upon the

plaintiff to present expert testimony in support of the allegations to establish a prima facie case

of malpractice.'" *Sitts v. United States*, 811 F.2d 738, 739 (2d Cir. 1987) (quoting *Keane v.

Sloan–Kettering Inst. for Cancer Research*, 464 N.Y.S. 2d 548, 549 (App. Div. 1983)); *see also

Foley v. United States*, 294 F. Supp. 3d 83, 96 (W.D.N.Y. 2018) (holding that the plaintiff could

not establish a medical malpractice case without expert testimony because determining whether

decedent was timely diagnosed and whether delay caused decedent's condition was "not within

the understanding of the ordinary layman" (internal citation and quotation marks omitted)); *Vale

v. United States*, No. 10-CV-4270, 2015 WL 5773729, at *4 (E.D.N.Y. Sept. 30, 2015) ("Since

[the] [p]laintiff has failed to provide admissible testimony from a qualified expert that

demonstrates that [the] [d]efendant deviated from the applicable standard of care and that [the]

[d]efendant's deviation was the proximate cause of [the] [p]laintiffs injuries, [the] [d]efendant's

motion for summary judgment is granted.").

 At the summary judgment stage, a court can "decide questions regarding the admissibility

of evidence, including expert opinion evidence." *Bah v. Nordson Corp*., No. 00-CV-9060, 2005

WL 1813023, at *6 (S.D.N.Y. Aug. 1, 2005) (citing *Raskin*, 125 F.3d at 66). "This is true even

if the exclusion of expert testimony would be outcome-determinative." *Berk*, 380 F. Supp. 2d at

351. "If a proffer of expert testimony is excluded as inadmissible pursuant to [Fed. R. Evid.]

702, the court must make the summary judgment determination on a record that does not include

that evidence." *Colon ex rel. Molina v. BIC USA, Inc*., 199 F. Supp. 2d 53, 68 (S.D.N.Y. 2001).

 Rule 702 of the Federal Rules of Evidence provides:

A witness who is qualified as an expert by knowledge, skill, experience, training,
or education may testify in the form of an opinion or otherwise if: (a) the expert's

scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702.  Although it is the role of the jury to determine the credibility of an expert witness, it is the role of the trial court to serve as a "gatekeeper" to ensure that the expert testimony is reliable and relevant before it is presented to the jury.  *See Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 147 (1999) (finding that the trial judge's gatekeeping obligation applies to all expert testimony); *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 597 (1993) (holding that the district court must ensure that a witness is qualified as an expert and "that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand").

"[T]he proponent of expert testimony has the burden of establishing by a preponderance of the evidence that the admissibility requirements of Rule 702 are satisfied."  *United States v. Williams*, 506 F.3d 151, 160 (2d Cir. 2007); *LVL XII Brands, Inc. v. Louis Vuitton Malletier S.A.*, 209 F. Supp. 3d 612, 635 (S.D.N.Y. 2016) (same).  "The trial judge has broad discretion in the matter of the admission or exclusion of expert evidence."  *Salem v. United States Lines Co.*, 370 U.S. 31, 35 (1962); *Zerega Ave. Realty Corp. v. Hornbeck Offshore Transp., LLC*, 571 F.3d 206, 213 (2d Cir. 2009) ("The decision to admit expert testimony is left to the broad discretion of the trial judge and will be overturned only when manifestly erroneous.").

### i.  Dr. Danoff's Qualifications

The Court must first address "the threshold question of whether a witness is qualified as an expert by knowledge, skill, experience, training, or education to render his or her opinions."  *Nimely v. City of New York*, 414 F.3d 381, 396 n.11 (2d Cir. 2005).  In doing this, the Court asks "whether the proffered expert has the educational background or training in a relevant field . . .

by looking at the totality of the witness's background." *Arista Records LLC v. Lime Grp. LLC*, No. 06-CV-5936, 2011 WL 1674796, at *2 (S.D.N.Y. May 2, 2011) (citations and internal quotation marks omitted). Then, the Court must "compare the area in which the witness has superior knowledge, education, experience, or skill with the subject matter of the proffered testimony," to "ensure that the expert will actually be testifying on issues or subject matters within his or her area of expertise." *Id.* (alteration, citations, and internal quotation marks omitted). Courts in the Second Circuit liberally construe the expert qualifications requirement, and generally will not exclude expert testimony provided "the expert has educational and experiential qualifications in a general field closely related to the subject matter in question." *In re Zyprexa Prods. Liab. Litig.*, 489 F. Supp. 2d 230, 282 (E.D.N.Y. 2007); *see also In re Rezulin Prods. Liab. Litig.*, 309 F. Supp. 2d 531, 559 (S.D.N.Y. 2004) ("The Second Circuit has taken a liberal view of the qualification requirements of Rule 702, at least to the extent that a lack of formal training does not necessarily disqualify an expert from testifying if he or she has equivalent relevant practical experience."). An expert "need not be a specialist in the exact area of medicine implicated by the plaintiff's injury, [but] he must have relevant experience and qualifications such that whatever opinion he will ultimately express would not be speculative." *Loyd v. United States*, No. 08-CV-9016, 2011 WL 1327043, at *5 (S.D.N.Y. Mar. 31, 2011) (internal citations and quotations omitted); *see also In re Fosamax Prods. Liab. Litig.*, No. 06-CV-7631, 2009 WL 4042769, at *6 (S.D.N.Y. Nov. 23, 2009) (holding that doctors need not be "specialist[s] in the exact area of medicine implicated by the plaintiff's injury") (citing *McCullock v. H.B. Fuller Co.*, 61 F.3d 1038, 1043 (2d Cir. 1995)).

Looking at the totality of Dr. Danoff's background, the Court concludes that he has the educational credentials, experience, and training to testify as a neonatology expert in this case.

Dr. Danoff has practiced neonatal medicine for over 50 years, managed thousands of neonatal cases, including hundreds of cases of neonatal hypoxia, metabolic and respiratory acidosis, served as the chief of neonatal medicine at a hospital for two decades, completed a fellowship in neonatal medicine at Columbia University Medical School, and still makes rounds at the NICU at Columbia Presbyterian Hospital to stay current.  (Danoff Expert Rep. 2–5; Pls.' 56.1 ¶ 128.) *See Bosco v. United States*, No. 14-CV-3525, 2016 WL 5376205, at *9–10 (S.D.N.Y. Sept. 26, 2016) (finding the plaintiff's proposed expert, a board-certified urologist surgeon and clinical instructor of surgery who had performed hundreds of ureterostomy procedures, and who based his opinion on his clinical experience, training, and education, qualified in malpractice case involving spleen injury even though he was not a lymphatic system specialist); *In re Fosamax Prods. Liab. Litig.*, 688 F. Supp. 2d 259, 268 (S.D.N.Y. 2010) (finding proposed expert to be qualified because the record showed that "[h]e has practiced dentistry for over 30 years; he specializes in oralfacial pain and maxillofacial radiology; he keeps up to date with the developments in research regarding [the medical condition in question] and has given presentations on the issue; he also has practical experience in that he has treated many patients" with the condition in question).

　　　To be sure, there are some gaps in Dr. Danoff's qualifications.  He retired as an active practitioner 14 years ago, does not take any continuing medical education courses and has not done so in 15 years, is not aware of the most recent edition of the Neonatal Resuscitation Textbook, is not aware of the recent research that warns of the dangers of sodium bicarbonate, and has testified as an expert only once in the last five years.  (Pls.' 56.1 ¶¶ 55, 57, 61, 120.)  The neonatal Defendants cite *Foley*, 294 F. Supp. 3d 83, in which the court held that the plaintiff's proposed expert, a board-certified doctor in emergency medicine, could not testify as an expert

on clostridium difficile, an infection, because the plaintiff offered no explanation as to how the doctor's alleged expertise in emergency medicine qualified him to opine on a deadly infection, *id*. at 96, and to *Vale*, 2015 WL 5773729, in which the court held that plaintiff's proposed expert, an anesthesiologist who had not practiced in 16 years, had made misrepresentations to the court about his qualifications, and who had never testified as an expert before, was not qualified to opine on serious complications from a gastroenterological disease, *id*. at *3 n.3. (Hines Mem. 7; Senguttuvan Reply 5.) However, the expert in *Vale* was not disqualified only because he had not practiced in years, but because he lied to the Court and did not explain his experience in gastroenterology. *Id*. The Court is not aware of a case within the Second Circuit disqualifying an expert solely on the grounds that the expert had not actively practiced in years. Unlike the proposed experts in *Foley* and *Vale*, Dr. Danoff has testified at length about his education, training, and experience in neonatology, and Defendants have not shown that Dr. Danoff misrepresented his credentials to the Court.

Defendants may cross-examine Dr. Danoff about the gaps in his credentials and argue that the fact finder should not give much or any weight to Dr. Danoff's testimony. But it is not for the Court at this stage to assess Dr. Danoff's credibility or to decide how much weight his testimony should be given. *See Jeffreys*, 426 F.3d at 551 (holding that "district courts may not weigh evidence or assess the credibility of witnesses at the summary judgment stage").

### ii. Reliability of Dr. Danoff's Testimony

"In determining whether an expert's opinion should be excluded as unreliable, 'the district court should undertake a rigorous examination of the facts on which the expert relies, the method by which the expert draws an opinion from those facts, and how the expert applies the facts and methods to the case at hand.'" *Houser v. Norfolk S. Ry. Co*., 264 F. Supp. 3d 470, 475

(W.D.N.Y. 2017) (quoting *Amorgianos v. Nat'l R.R. Passenger Corp.*, 303 F.3d 256, 267 (2d Cir. 2002)). "An expert opinion requires some explanation as to how the expert came to his conclusion and what methodologies or evidence substantiate that conclusion." *Riegel v. Medtronic, Inc.*, 451 F.3d 104, 127 (2d Cir. 2006). "[N]othing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence which is connected to existing data only by the ipse dixit of the expert. A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered." *Nimely*, 414 F.3d at 396 (quoting *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997)). Thus, "when an expert opinion is based on data, a methodology, or studies that are simply inadequate to support the conclusions reached, *Daubert* and Rule 702 mandate the exclusion of that unreliable opinion testimony." *Amorgianos*, 303 F.3d at 266.

With respect to Dr. Danoff's opinion that sodium bicarbonate should have been administered sooner, Nurse Hines argues Dr. Danoff's testimony is not reliable by pointing to the Neonatal Resuscitation Textbooks which states that the administration of sodium bicarbonate is controversial and that it can be harmful. (Hines Mem. 10.) Nurse Hines cites the opinion of her own expert, Warren Rosenfeld, M.D. ("Dr. Rosenfeld"), that if sodium bicarbonate had been given in the delivery room to I.M., it would have presented a breach of the standard of care because NRP states that sodium bicarbonate should not be used early in a resuscitation (Hines Mem. 11 (citing Rogers's Aff. Ex. M, at 5 ("Rosenfeld Expert Rep."))). Nurse Hines also cites Dr. Senguttuvan's expert, Dr. Steele, (Hines Mem. 12 (citing Steele Expert Rep. 7–8)), and ORMC and Nurse Bast's expert, Ivan Hand, M.D. ("Dr. Hand") (Hines Mem. 13 (citing Rogers's Aff. Ex. O, at 4 ("Hand Expert Rep."))), both of whom opined that sodium bicarbonate could only be administered after proper ventilation was achieved and that sodium bicarbonate

was timely administered to I.M.  Nurse Hines's argument misses the point—the fact that Defendants' experts disagree with Dr. Danoff's conclusions does not render his testimony unreliable.  A reasonable jury could credit Dr. Danoff's opinion that sodium bicarbonate should have been administered, if not immediately, then certain before an hour since delivery went by.  It is not for the Court at this stage to decide which version of events and which explanation of I.M.'s injuries is more plausible.  *See Bale v. Nastasi*, 982 F. Supp. 2d 250, 258–59 (S.D.N.Y. 2013) ("Where each side . . . tells a story that is at least plausible and would allow a jury to find in its favor, it is for the jury to make the credibility determinations and apportion liability, and not for the court."); *see also Scott v. Coughlin*, 344 F.3d 282, 290–91 (2d Cir. 2003) (holding that "[t]he credibility of [plaintiff's] statements and the weight of contradictory evidence may only be evaluated by a finder of fact").

With respect to Dr. Danoff's opinion that the endotracheal tube was not properly placed, Nurse Hines points to evidence in the record that the baby's oxygenation and ventilation were not compromised.  (Hines Mem. 13.)  She cites Defendants' experts' opinions and an academic paper to argue that Dr. Danoff's opinion about the meaning of the baby's pH levels shows that he does not understand what cord gas findings represent.  (*Id.* at 14.)  Nurse Hines argues that Dr. Danoff improperly compared the cord gas pH reading of 7.087 with the baby's pH of 6.95 at 21 minutes of life.  She argues that the cord gas reading represented the baby's condition prior to the prolapse and is therefore an inaccurate point of comparison.  (*Id.*)  Here too, a reasonable jury could instead credit the academic articles Plaintiffs cite in their Memorandum and the portions of expert testimony Plaintiffs rely on to support their interpretation of what a baby's cord gas numbers and pH levels mean.  (*See* Pls.' Mem. 8–11.)  Nurse Hines further argues that Dr. Danoff did not explain his methodology for arriving at his opinions, but rather "merely states that

one set of figures which, on their face, appear to be a worse result, are indeed a worse result." (Hines Mem. 16.) This mischaracterizes Dr. Danoff's explanation—he argued that the causal chain was that the endotracheal tube was improperly placed, that this led to improper ventilation, which led to further hypoxia, worsening of the metabolic acidosis and respiratory acidosis, and that the lower pH is one piece of evidence supporting his theory. (Danoff Expert Rep. 9–10.) In his deposition he explained that a decrease in the pH was related to an increase in the severity of acidosis. (Danoff Dep. 82–83.) That Defendants disagree with Dr. Danoff about the utility and reliability of the cord gas reading does not render his testimony unreliable.[43]

Nurse Hines makes similarly unavailing arguments about Dr. Danoff's testimony regarding I.M.'s twitching and whether phenobarbital should have been administered sooner. She cites Defendants' experts' opinions concluding that the twitching was not necessarily indicative of seizure activity. (Hines Mem. 16–17.) This only further points out that there is a factual dispute as to whether and when I.M. was experiencing seizures and when phenobarbital should have been administered. Nurse Hines also argues that Dr. Danoff jumped to the conclusion that I.M. was experiencing seizures without explaining his method for reaching that conclusion. (*Id*. at 18.) Dr. Danoff, however, did in fact explain that he concluded the baby's early twitching was seizure activity because of her condition at birth and because of the various other symptoms she was exhibiting, and he pointed out that the baby was eventually diagnosed

---

[43] Dr. Senguttuvan unsuccessfully attempts to undermine the reliability of Dr. Danoff's testimony by mischaracterizing portions of his deposition transcript to make it appear that he testified that he ignored the medical charts and evidence in the record in forming his opinions. For example, Dr. Senguttuvan argues that Dr. Danoff "criticized [her] for not being present in the delivery room at a certain time, then admitted that he had no idea when she was called," (Senguttuvan Mem. 5), when in fact Dr. Danoff testified that she was called when the entire neonatal team was called because according to her own testimony she was the head of the neonatal team, and in his opinion it took her too long to get to the baby, (Danoff Dep. 45–46).

with and treated for seizures.  (Danoff Expert Rep. 9–10.)  Dr. Danoff conceded that there are many reasons babies twitch, but concluded, "[t]his baby was seizing.  The baby was acidotic. The baby was hypoxic at or before birth . . . .I am not talking about some hypothetical baby who twitched."  (Danoff Dep. 98.)

The Court concludes that there is enough in the record to reject the claim that Dr. Danoff's testimony is unreliable.  He explained what he believes Defendants' deviations from the standard of care were, what evidence he reviewed, how he arrived at his opinions, and his statements are not clearly contradicted by the record.  *Cf. Foley*, 294 F. Supp. 3d at 93–94 (finding expert testimony was not reliable where expert failed to explain connection between medical condition decedent was allegedly suffering from and the care provided by the defendants, proposed expert based opinion on statements that were contracted by the record, and failed to explain how he arrived at his opinions); *Vale*, 2015 WL 5773729, at *3 (finding expert testimony was not reliable because doctor provided no foundational basis for his opinion, no explanation for how defendants was negligent except for one isolated unsupported statement, and his conclusions were "merely speculative").

Because the Court concludes that Dr. Danoff is qualified to testify and does not find his testimony unreliable, neonatal Defendants' argument that Plaintiffs cannot prevail on their medical malpractice claim because they do not have a qualified expert, fails.

### iii.  Medical Malpractice Claim as to Nurse Hines

The only argument Nurse Hines put forth for summary judgment on the medical malpractice claim was that Plaintiffs' expert was not qualified.  She did not submit evidence or argue that there is no factual dispute as to whether her actions breached the standard of care, or whether a breach of the standard of care caused I.M.'s injuries.  *See Lettman*, 2013 WL 4618301,

at *3 (noting that to establish a medical malpractice claim a plaintiff must prove "(1) that the defendant breached the standard of care in the community, and (2) that the breach proximately caused the plaintiff's injuries" (citation omitted)). And indeed, Nurse Hines could not successfully have made an argument that there are no material factual disputes—as the Court's discussion so far makes clear, the propriety of most of the actions taken by neonatal Defendants is in dispute. The Court therefore denies Nurse Hines's Motion for Summary Judgment with respect to Plaintiffs' medical malpractice claim.

### iv.  Medical Malpractice Claim as to Dr. Senguttuvan

Dr. Senguttuvan argues that the existence of a patient-doctor relationship is a question of law and that the Court should find she did not have a duty to I.M. because she arrived at the hospital after the alleged malpractice. (Senguttuvan Mem. 7–10.)[44]

Under New York law a physician-patient "relationship is created when the professional services of a physician are rendered to and accepted by another person for the purposes of medical or surgical treatment." *Lee v. New York*, 560 N.Y.S. 2d 700, 701 (App. Div. 1990) (internal citation omitted). "[W]hether the physician's giving of advice furnishes a sufficient basis upon which to conclude that a physician patient relationship had arisen is a question of fact

---

[44] Dr. Senguttuvan argues that the existence of the physician-patient relationship is a question of law for the Court to decide. She cites cases, however, that involve consulting physicians who were not involved in the patient's treatment and at most provided an informal opinion to an associate, or performed an inconsequential lab test. (Senguttuvan Mem. 7 (citing *Sawh v. Schoen*, 627 N.Y.S.2d 7, 8 (App. Div. 1995) (dismissing case against doctor who discussed patient's treatment with her treating physician at a medical practice's weekly meeting finding there was no physician-patient relationship); *Lipton v. Kaye*, 624 N.Y.S. 2d 590, 592 (App. Div. 1995) (dismissing case against pathologist who performed amniocentesis, the results of which were normal, and who was not the treating obstetrician, finding there was no physician-patient relationship).) But, according to her own testimony, Dr. Senguttuvan provided treatment to I.M. and was the attending neonatologist working on I.M.'s care. (Pls.' 56.1 ¶¶ 38, 89–90, 259–60, 271–73.)

for the jury." *Rogers v. Maloney*, 909 N.Y.S.2d 592, 593 (App. Div. 2010); *Campbell v. Haber*, 710 N.Y.S.2d 495, 496 (App. Div. 2000) (same). New York courts do not require proof of a formal consultation—"[an] implied physician-patient relationship may arise when a physician gives advice to a patient, even if that advice is communicated through another health care professional." *Campbell*, 710 N.Y.S.2d at 496.

As the Court discussed in *supra* Section I.A.3.a, Dr. Senguttuvan's testimony that sodium bicarbonate and phenobarbital were administered before she arrived, and that she only entered a cabinet override, conflicts with Nurse Hines's testimony that the sodium bicarbonate injection was administered at 11:04 a.m., and that the phenobarbital was first given at 11:58 a.m., both after Dr. Senguttuvan arrived. Nurse Hines testified that she and Dr. Senguttuvan were responsible for the timing of when sodium bicarbonate and phenobarbital were given. (Hines Dep. 141–42). Dr. Senguttuvan's argument that she arrived over an hour after the endotracheal tube was first placed, (Senguttuvan Mem. 9), is also unavailing because Dr. Senguttuvan testified that the whole NICU team, of which she was a part, was responsible for monitoring the vent settings and the endotracheal tube, (Pls.' 56.1 ¶¶ 259–60). Dr. Senguttuvan at one point ordered an adjustment of the mechanical ventilation settings. (*Id*. ¶ 258). Where the evidence presents "a question of 'he said, she said'" the court "cannot . . . take a side at the summary judgment stage." *Fincher v. Depository Trust & Clearing Corp.*, 604 F.3d 712, 726 (2d Cir. 2010); *see also Kassel v. City of Middletown*, 272 F. Supp. 3d 516, 535 (S.D.N.Y. 2017) (noting that "it is not the role of the [c]ourt at summary judgment to resolve [a] factual clash"). The Court cannot conclude at this stage that Dr. Senguttuvan arrived at the hospital after the alleged malpractice occurred.

Dr. Senguttuvan herself testified that she evaluated I.M.'s condition and provided medical care and treatment to I.M. (Pls.' 56.1 ¶¶ 271–72.) From the time Dr. Senguttuvan arrived until I.M. was transferred, I.M.'s care was managed by her and the NICU team. (*Id.* ¶¶ 259–60, 273.) Dr. Senguttuvan was the attending neonatologist working on I.M.'s treatment, (*id.* ¶¶ 89–90), as there were no other neonatologists at the hospital until she arrived, (Senguttuvan Dep. 38). Dr. Senguttuvan also testified that she had the authority to instruct Nurse Hines and the other nurses in the treatment of I.M. (*Id.* at 46.) A reasonable jury could conclude that Dr. Senguttuvan was present during critical portions of I.M.'s treatment and provided care that established a physician-patient relationship. Thus, Dr. Senguttuvan's argument that she had no duty to I.M. fails at this stage.

Dr. Senguttuvan did not submit evidence or argue that there is no factual dispute as to whether her actions breached the standard of care, or whether a breach of the standard of care caused I.M.'s injuries. *See Lettman*, 2013 WL 4618301, at *3. And indeed, she could not successfully have argued that there are no material factual disputes as to these elements given that the propriety of most of the actions taken by neonatal Defendants are contested. The Court therefore denies Dr. Senguttuvan's Motion for Summary Judgment with respect to Plaintiffs' medical malpractice claim.

### b. Nurse Bast

Nurse Bast and ORMC argue that Plaintiffs cannot succeed on their medical malpractice claim because they did not submit an expert report from an expert in obstetrical nursing or from any nursing expert. They argue that Dr. Danoff and Dr. Hamar are not qualified to testify about obstetrical nursing, and that Dr. Hamar failed to state any alleged deviations from the standard of

obstetrical nursing care attributable to Nurse Bast because his overall criticism was directed at Dr. DiCostanzo.  (ORMB and Bast Mem. 12–14.)[45]

As noted, an expert "need not be a specialist in the exact area of medicine implicated by the plaintiff's injury."  *Loyd*, 2011 WL 1327043, at *5; *In re Fosamax Prods. Liab. Litig*., 2009 WL 4042769, at *6 (same); *accord Creekmore v. Maryview Hosp*., 662 F.3d 686, 692 (4th Cir. 2011) (holding that the district court acted within its discretion in determining that high-risk preeclamptic patient's expert-witness obstetrician was qualified to testify in medical malpractice action in which nurses allegedly deviated from standard of care because risks inherent to preeclamptic patients were well known to both physicians and nurses and the obstetrician was familiar with the procedure at issue).  The Court is not aware of a case in the Second Circuit holding that a doctor in a specialty cannot testify as an expert about nursing in that same specialty, and Nurse Bast and ORMC do not cite to such a case.  Both Dr. Hamar and Dr. Danoff have knowledge of the standards applicable to cord prolapse treatment by doctors and nurses in labor and delivery and neonatal resuscitation respectively, given their experience in managing these situations.  The Court finds Dr. Hamar and Dr. Danoff are qualified to testify as experts on whether nurses in obstetrics and neonatology respectively deviated from the standard of care.

Nurse Bast also argues that Dr. Hamar did not base his opinion on facts personally known to him or facts contained in the record.  (ORMC and Bast Reply 6.)  But Dr. Hamar outlined in his expert report that he reviewed the ORMC records for Ms. Hartmann and I.M., and the deposition transcripts of Nurse Bast, Dr. DiCostanzo, Ms. Hartmann, Nurse Hines, Dr. Kothari,

---

[45] Nurse Bast and ORMC do not argue that Dr. Hamar is not qualified to testify on obstetrics, and indeed that argument would likely be unsuccessful.  Dr. Hamar is an experienced board-certified obstetrician and gynecologist who currently practices at several hospitals and is a Professor at Harvard Medical School.  (Hamar Expert Rep. 2.)

and Dr. Senguttuvan.  (Hamar Expert Rep. 2.)  Nurse Bast and ORMC make no further arguments about Dr. Hamar's reliability, and the Court is satisfied based on a review of Dr. Hamar's testimony, that he provided sufficient "explanation as to how [he] came to his conclusion and what methodologies or evidence substantiate that conclusion." *Riegel*, 451 F.3d at 127.

Nurse Bast and ORMC also argue that Dr. Hamar did not attribute any deviations to Nurse Bast.  This is incorrect.  Dr. Hamar attributed the failure to monitor the baby's heart rate after the prolapsed cord diagnosis to Nurse Bast.  (Hamar Expert Rep. 5–6.)  He also attributed the 12-minute delay from getting to the OR to starting surgery to the whole surgical team.  (*Id*. at 7–8.)  And, he attributed the 10-minute delay from diagnosis to leaving for the OR to "Dr. DiCostanzo, Nurse Bast, and the ORMC staff."  (*Id.* at 9.)

Defendants ORMC and Bast also cite to portions of the ORMC charts and their own expert testimony to argue that Nurse Bast followed the standard of care.  (ORMC and Bast Reply 8–10.)  This only highlights that there are disputed questions of fact regarding whether Nurse Bast breached the standard of care and whether her breach proximately caused Plaintiffs' injuries.  See *Lettman*, 2013 WL 4618301, at *3.  The Court therefore denies Nurse Bast's Motion for Summary Judgment with respect to Plaintiffs' medical malpractice claim.

### c.  ORMC

#### i.  Vicarious Liability as to Non-Employees

Under the doctrine of respondeat superior, a hospital may be vicariously liable for the medical malpractice of physicians, nurses, and other healthcare professionals who act in an employment or agency relationship to the hospital.  *See Hill v. St. Clare's Hospital,* 490 N.E.2d 823, 824 (N.Y. 1986) (holding that a physician who owns a medical clinic which is held out to

the public as offering medical services may be held vicariously liable for the malpractice of a treating doctor even though the owner neither participated in nor controlled the treatment); *Macias v. Ferzli*, 15 N.Y.S.3d 466, 468–470 (App. Div. 2015) (denying summary judgment to defendant hospital, obstetrical and gynecological resident, and others, relating to pregnant patient's respiratory distress and death, because the hospital, which could be vicariously liable, and residents, failed to make a prima facie showing that they were not responsible for medical malpractice); *Scalisi v. Oberlander*, 943 N.Y.S.2d 23, 34–35 (App. Div. 2012) (denying summary judgment to defendant hospital, obstetrician, and pediatricians, because plaintiff's experts raised genuine issues of material fact as to whether the hospital, which could be vicariously liable, departed from the standard of care).

However, a hospital is generally not liable for the malpractice of a private physician who does not serve as an employee or agent of the hospital, and who independently treats a patient at a hospital as an independent private physician. *See Raschel v. Rish*, 504 N.E.2d 389, 391 (N.Y. 1986) ("For a hospital to be vicariously liable for the negligence of a physician, ordinarily an employment relationship, rather than mere affiliation, is required."); *see also Smith v. Agnant*, 15 N.Y.S.3d 387, 389–90 (App. Div. 2015) (holding that although the hospital was not vicariously liable for the alleged malpractice of the private attending physicians involved in the birth of the child, genuine issues of material fact existed as to whether the hospital was directly liable for the alleged malpractice of physicians and medical personnel it employed and denying summary judgment as to those employees); *Sledziewski v. Cioffi*, 528 N.Y.S.2d 913, 915–16 (App. Div. 1988) (finding that hospital was not liable for malpractice of chief OBGYN when hospital exercised no control over the physician's practice, and physician was not employed or compensated by hospital).

"[A]n exception to the general rule exists when a patient comes to an emergency room seeking treatment from the hospital and not from a particular physician of the patient's choosing." *Orgovan v. Bloom*, 776 N.Y.S.2d 879, 879 (App. Div. 2004); *see also Tart v. New York Bronx Pediatric Medicine, P.C.*, 984 N.Y.S.2d 19, 21 (App. Div. 2014) (holding that hospital and contractor that operated the NICU unit could be held vicariously liable for the physician's negligence, regardless of his employment status, where the contractor assigned the physician to the shift in which the patient was treated, and the patient's mother arrived at the emergency room by ambulance, seeking care from the hospital, rather than from an individual physician); *Mduba v. Benedictine Hosp.*, 384 N.Y.S.2d 527, 529–30 (App. Div. 1976) (holding that "the defendant hospital, having held itself out to the public as an institution furnishing doctors, staff and facilities for emergency treatment, was under a duty to perform those services and is liable for the negligent performance of those services by the doctors and staff it hired and furnished").

Vicarious liability for the malpractice of a private attending may also be imposed upon on a hospital under a theory of apparent or ostensible agency. *See Dragotta v. Southampton Hosp.*, 833 N.Y.S.2d 638, 640 (App. Div. 2007).

> In order to create such apparent agency, there must be words or conduct of the principal, communicated to a third party, which give rise to the appearance and belief that the agent possesses the authority to act on behalf of the principal. The third party must reasonably rely on the appearance of authority, based on some misleading words or conduct by the principal, not the agent. Moreover, the third party must accept the services of the agent in reliance upon the perceived relationship between the agent and the principal, and not in reliance on the agent's skill.

*Id*. at 698 (internal citations omitted); *see also Sampson v. Cantillo*, 865 N.Y.S.2d 634, 636 (App. Div. 2008) (holding that the plaintiff failed to rebut the prima facie showing of the

defendant hospital that the defendant doctor was not an employee and that the general rule did not apply).

A defendant hospital moving for summary judgment on the ground that it is not vicariously liable for malpractice of physicians who are not its employees must submit evidence demonstrating the absence of material issues of fact concerning ostensible or apparent agency. *See Mezzone v. Goetz*, 43 N.Y.S.3d 331, 332 (App. Div. 2016) (denying summary judgment to defendant hospital because genuine issues of material fact existed as to whether the patient's referral to hospital's podiatry clinic, generally, rather than to a specific doctor, rendered the hospital liable under agency principles); *Contreras v. Adeyemi*, 958 N.Y.S.2d 430, 432 (App. Div. 2013) (denying summary judgment where hospital failed to establish a prima facie case that it was not vicariously liable for the acts of the offsite radiologist, as the hospital failed to submit evidence that the radiologist was not under its control and not its agent in providing care to the patient); *Finnin v. St. Barnabas Hosp.*, 761 N.Y.S.2d 213, 214 (App. Div. 2003) (denying summary judgment where an issue of fact existed as to whether decedent reasonably believed that the physician who treated him at defendant hospital was provided by defendant hospital); *Halkias v. Otolaryngology-Facial Plastic Surgery Assocs.*, 724 N.Y.S.2d 432, 433 (App. Div. 2001) (denying summary judgment where the hospital failed to establish absence of issues of fact as to "whether the plaintiff sought medical care from [the hospital] rather than from a particular physician" and finding that it was insufficient for the hospital to show that a doctor "was employed by another entity").

Defendants Dr. DiCostanzo, Dr. Senguttuvan, Nurse Hines, and Dr. Kothari or NAPA were not ORMC employees and under the general rule, ORMC would ordinarily not be vicariously liable for its non-employees' alleged malpractice. *See Raschel*, 69 N.Y.2d at 697.

Plaintiffs argue that the emergency exception to the rule applies. (Pls.' Mem. 30.) ORMC counters that Ms. Hartmann did not come to ORMC for emergency treatment, but rather that she came at the instruction of her obstetrician at MCHC. (ORMC and Bast Mem. 9–10; ORMC and Bast Reply 10.) Indeed, Ms. Hartmann's birthing plan was to deliver at ORMC, with the assigned physician employed at MCHC on the day of her delivery. She knew that MCHC patients delivered at ORMC. (Pls.' 56.1 ¶ 176.) However, she also entered the hospital through the emergency department, (*id.* ¶ 177), and eventually underwent an emergency c-section and received other emergency treatment, (*id.* ¶ 180). She interacted with Dr. DiCostanzo, Dr. Senguttuvan, Nurse Hines, and Dr. Kothari under emergency circumstances and none of them was her OBGYN. (*Id.* ¶¶ 12, 175–76, 180.) All the alleged deviations from the standard of care occurred during the administration of emergency treatment. Ms. Hartmann arguably did not have any particular doctor in mind when she sought life-saving treatment and expected that a hospital that held itself out as providing emergency services would do so in accordance with the standard of care. *See Orgovan*, 776 N.Y.S.2d at 879 (holding that an exception to the general rule applies when "a patient comes to an emergency room seeking treatment from the hospital and not from a particular physician of the patient's choosing"); *Mduba*, 384 N.Y.S.2d at 529–30 (same). A reasonable jury could find that although Ms. Hartmann had planned to deliver at ORMC, she received emergency treatment from Defendants on the night in question. ORMC has not submitted any evidence to show Ms. Hartmann did not believe she was receiving emergency treatment after her cord prolapse was diagnosed. It is not for the Court to decide whether Ms. Hartmann was, at the time she was receiving the allegedly negligent treatment, expecting emergency treatment from the hospital or treatment from a doctor of her choosing. *See Vital v. Interfaith Med. Ctr.*, 168 F.3d 615, 622 (2d Cir. 1999)

("Assessments of . . . choices between conflicting versions of the events are matters for the jury, not for the court on summary judgment." (citation omitted)). The Court concludes that there is a factual dispute as to whether the emergency exception applies. If a jury were to find that this exception applies, ORMC would be vicariously liable for the alleged malpractice of Dr. DiCostanzo, Dr. Senguttuvan, Nurse Hines, or Dr. Kothari or NAPA. Because there is a question of fact as to whether ORMC is vicariously liable for Dr. DiCostanzo, Dr. Senguttuvan, Nurse Hines, or Dr. Kothari or NAPA's alleged malpractice, the Court denies ORMC and Nurse Bast's Motions for Summary Judgment with respect to vicarious liability.

The Court could deny summary judgment on the grounds of the emergency exception alone, but will also briefly address whether the apparent agency exception applies. ORMC argues that Ms. Hartmann knew Dr. DiCostanzo was not an agent of ORMC and that she was instead affiliated with MCHC. (ORMC and Bast Mem. 8–9.) Ms. Hartmann indeed testified that she knew who Dr. DiCostanzo was as she had seen her walking around at MCHC even though she never had her as her doctor. (Hartmann Dep. 123.) However, ORMC failed to establish that there was no issue of fact as to whether Ms. Hartmann expected treatment from the hospital or from Dr. DiCostanzo. Ms. Hartmann had expected to have an MCHC doctor help her with a natural vaginal delivery. (Pls.' 56.1 ¶¶ 9, 175–76, 178.) Once the treatment turned into an emergency c-section, it is not at all clear that Ms. Hartmann still expected MCHC and Dr. DiCostanzo, rather than ORMC, to provide care. *See Halkias*, 282 A.D.2d at 651 (denying summary judgment where hospital failed to establish absence of issues of fact as to "whether the plaintiff sought medical care from [the hospital] rather than from a particular physician"). "Assessments of . . . choices between conflicting versions of the events are matters for the jury." *Vital*, 168 F.3d at 622. A reasonable jury could conclude that because the emergency treatment

Ms. Hartmann ended up receiving was different from what she had expected from an MCHC doctor, Ms. Hartmann was seeking medical care from ORMC.

As for Dr. Senguttuvan, Nurse Hines, and Dr. Kothari or NAPA's affiliation with ORMC, ORMC argues that it made no representations about their relationship to the hospital, and that there is no testimony from Ms. Hartmann that she relied on representations by ORMC. (ORMC and Bast Mem. 12.) Plaintiffs counter that ORMC held itself out as controlling Dr. Senguttuvan and Nurse Hines because they both provided treatment to I.M. only because of their relationship with ORMC—Ms. Hartmann did not choose them as the emergency neonatal service provider. (Pls.' Mem. 30–32.) Dr. Senguttuvan was the only neonatologist attending at ORMC when she arrived, (Senguttuvan Dep. 38), and Nurse Hines was the only neonatology nurse practitioner on the premises at ORMC that morning, (*id.* at 42). Dr. Senguttuvan even testified that she wore a security badge that had "Orange Regional Medical Center" on it. (*Id.* at 61.) ORMC had the burden of submitting evidence to show that there is no material issue of fact concerning apparent agency, *see Contreras*, 958 N.Y.S.2d at 432 (denying summary judgment where hospital failed to submit evidence that the offsite radiologist was not under its control and not its agent in providing care to the patient), and the Court finds that it failed to do so. A reasonable jury could conclude Dr. Senguttuvan, Nurse Hines, and Dr. Kothari or NAPA were held out as agents of ORMC. Indeed, after the cord prolapse was called, about twelve medical professionals rushed into Ms. Hartmann's room and she was wheeled away to receive anesthesia and surgery at ORMC. (DiCostanzo Dep. 185–86.) A reasonable jury could conclude that Ms. Hartmann understood that all the staff to be involve in her emergency care were provided by ORMC.

If a jury were to find that the apparent agent exception applies, ORMC would be vicariously liable for their alleged malpractice. Because there is a question of fact as to whether ORMC is vicariously liable for Dr. DiCostanzo, Dr. Senguttuvan, Nurse Hines, or Dr. Kothari or NAPA's alleged malpractice, the Court denies ORMC and Nurse Bast's Motions for Summary Judgment with respect to ORMC's vicarious liability for its non-employees.[46]

## ii. Liability for Negligence of Employees

ORMC further argues that even if one of its employees, like Nurse Bast, was negligent, the hospital is shielded from liability where the employee acted at the instruction of a private attending physician. (ORMC and Bast Mem. 14–16.) Plaintiffs counter that hospitals and their employees may be concurrently liable with private attending physicians, and that Nurse Bast committed independent acts of negligence. (Pls.' Mem. 27–28.)

"A hospital may not be held liable for injuries sustained by a patient who is under the care of a private attending physician chosen by the patient where the resident physicians and nurses employed by the hospital merely carry out the orders of the private attending physician, unless the hospital staff commits 'independent acts of negligence or the attending physician's orders are contraindicated by normal practice.'" *Gattling v. Sisters of Charity Med. Ctr.*, 53 N.Y.S.3d 665, 669 (App. Div. 2017) (quoting *Tomeo v. Beccia*, 7 N.Y.S.3d 472, 474 (App. Div. 2015) (finding that hospital was not liable for the infant's injuries, where the hospital's

_____

[46] The Court rules herein that the medical malpractice and loss of services claims against Dr. Senguttuvan and Dr. Hines survive and may be presented to a fact finder. *See supra* Sections II.B.1.a.iii–iv, II.B.3. Depending on the determination of the fact-finder, ORMC may be vicariously liable for those claims. Dr. Kothari or NAPA, and Dr. DiCostanzo, now substituted as a Party by the United States, have not filed any motions at this juncture and the Court will not decide whether claims against them survive the summary judgment stage without giving them an opportunity to submit Rule 56.1 materials and briefing. If claims against them survive, ORMC may be vicariously liable for those claims as well.

employees properly followed orders and directives of the mother's attending physician and did not commit any independent acts of negligence)); *see also Toth v. Community Hosp. at Glen Cove*, 239 N.E.2d 368, 374 (N.Y. 1968) ("The primary duty of a hospital's nursing staff is to follow the physician's orders, and a hospital is normally protected from tort liability if its staff follows the orders."); *Bedard v. Klein*, 930 N.Y.S.2d 656, 658 (App. Div. 2011) (affirming dismissal of medical malpractice case where plaintiffs failed to raise a triable issue because hospital staff did not exercise independent judgment over the plaintiff's case and the "orders of the attending physicians were not so clearly contradicted by normal obstetrical practice that ordinary prudence would require inquiry into the correctness of the orders"); *Bellafiore v. Ricotta*, 920 N.Y.S.2d 373, 374 (App. Div. 2011) (finding the defendants were entitled to summary judgment where they "met their prima facie burden of demonstrating that, during their treatment of the decedent, they did not exercise any independent medical judgment, but were under the direct supervision of their attending physicians, whose directions did not so greatly deviate from normal practice that the defendants should be held liable for failing to intervene").

However, "a hospital may . . . be held concurrently liable with a private practitioner for the independent negligence of the former's medical staff." *Gerner v. Long Island Jewish Med. Ctr.*, 609 N.Y.S.2d 898, 899–900 (App. Div. 1994) (reversing summary judgment granted to the defendant hospital where the plaintiff gave birth at hospital six hours before her attending private physician arrived and where even during the time that the infant was technically under the care of a private attending physician there were allegations of independent negligent acts attributable solely to the hospital staff); *Laub v. Montefiore Hosp. & Med. Ctr.*, 496 N.Y.S.2d 229, 229–30 (App. Div. 1985) (modifying liability apportionment from 95 percent against defendant attending physician and five percent against hospital and its employees, to 50-50 percent apportionment

against the parties respectively, where both the doctor's failure to monitor the plaintiff's blood chlorine levels, and the hospital's failure to report the same to the doctor, led to late diagnosis of alkalosis).

ORMC and Nurse Bast point to the fact that, on the date of I.M.'s delivery, Dr. DiCostanzo was a private attending physician employed by MCHC, and she provided treatment as an employee of MCHC. (DiCostanzo Dep. 142.) She expected the ORMC medical staff and nurses, including Nurse Bast, to follow her instructions. (*Id*. at 77.) Plaintiffs, however, point out that there are alleged independent acts of negligence by Nurse Bast, such as the failure to monitor I.M. after the cord prolapse, and the delays in transferring Ms. Hartmann to the OR and then getting her prepared for anesthesia and surgery. (Hamar Expert Rep. 5.) Indeed, Dr. Hamar opined that everyone on the surgical team shared responsibility for causing the delay in getting Ms. Hartmann into surgery. (*Id*. at 9.) At the very least, this creates an issue of material fact about whether Nurse Bast committed independent acts of negligence or whether she administered all treatment at the instruction of Dr. DiCostanzo or independently. The Court "cannot . . . take a side at the summary judgment stage," *Fincher*, 604 F.3d at 726, and decide whether Nurse Bast or Dr. DiCostanzo are to be believed. A reasonable jury could find that Nurse Bast acted independently and that ORMC is therefore concurrently liable with Dr. DiCostanzo for any alleged malpractice.

The Court therefore denies ORMC and Nurse Bast's Motion for Summary Judgment on the question of ORMC's liability for Nurse Bast's possibly independent negligent acts.

### 2. Lack of Informed Consent

"To succeed in a medical malpractice cause of action premised on lack of informed consent, a plaintiff must demonstrate that (1) the practitioner failed to disclose the risks, benefits

and alternatives to the procedure or treatment that a reasonable practitioner would have disclosed and (2) a reasonable person in the plaintiff's position, fully informed, would have elected not to undergo the procedure or treatment." *Orphan v. Pilnik*, 940 N.E.2d 555, 556 (N.Y. 2010) (citing N.Y. Pub. Health Law §§ 2805–d(1), (3)). A plaintiff must also prove that the lack of informed consent is a proximate cause of the injury or condition for which recovery is sought. *See Walker v. Saint Vincent Cath. Med. Ctrs.*, 979 N.Y.S.2d 697, 698 (App. Div. 2014).[47]

"Expert medical testimony is required to prove the insufficiency of the information disclosed to the plaintiff." *Orphan*, 940 N.E.2d at 556 (citing N.Y. C.P.L.R. § 4401–a); *see also Tropeano v. Sandhu*, 80 N.Y.S.3d 46, 47 (App. Div. 2018) (affirming dismissal of lack of informed consent claim where the plaintiff's expert failed to demonstrate that the information disclosed to the plaintiff was insufficient); *Mitchell v. Lograno*, 970 N.Y.S.2d 58, 61 (App. Div. 2013) (dismissing lack of informed consent claim where the plaintiff's expert only testified that

---

[47] The Court is aware that, in an older line of New York cases, an action for lack of informed consent was sometimes considered an action for battery. As the Second Circuit explained in *Armstrong ex rel. Armstrong v. Brookdale U. Hosp. and Med. Ctr.*, 425 F.3d 126, 134 (2d Cir. 2005), "battery applies in the medical context only where the patient or her guardian gives *no* consent and the doctor intends to 'cause a bodily contact that a reasonable person would find offensive.'" *Id.* (quoting *Jeffreys v. Griffin*, 801 N.E.2d 404, 409 n.2 (N.Y. 2003)). "On the other hand, an informed consent violation occurs when the doctor obtains consent without giving the patient appropriate information concerning risks and alternatives." *Id.* (citing N.Y. Pub. Health Law § 2805–d). Recent appellate decisions, however, suggest New York law increasingly views lack of informed consent actions as medical malpractice actions. *See, e.g.*, *Soriano v. United States*, No. 12-CV-4752, 2013 WL 3316132, at *9 (S.D.N.Y. 2013) (collecting cases); *Messina v. Matarasso*, 729 N.Y.S.2d 4, 6 (App. Div. 2001) ("The modern approach . . . views the failure to obtain the informed consent of a patient as a form of medical malpractice based on negligence." (internal citations omitted)); *see also Prooth v. Wallsh*, 432 N.Y.S.2d 663, 664 (Sup. Ct. 1980) (noting "trend . . . toward adoption of a standard . . . which considers the failure to properly inform the patients of the risks of the operation to be negligence, a lack of due care, within the general principles of professional malpractice"). The Court therefore considers Plaintiffs' lack of informed consent claim in light of the general principles of medical malpractice and specifically the statutory requirements outlined in § 2805–d.

it was a deviation for the doctor to have failed to recommend a c-section and to seek the mother's consent for a c-section without otherwise addressing the insufficiency of information provided).

Moreover, by statute in New York, in order to recover under a lack of informed consent theory, the case must involve "either (a) non-emergency treatment, procedure or surgery, or (b) a diagnostic procedure which involved invasion or disruption of the integrity of the body." N.Y. Pub. Health Law § 2805–d(2); *see also Shinn v. St. James Mercy Hosp.*, 675 F. Supp. 94, 100–01 (W.D.N.Y. 1987), *aff'd* 847 F.2d 836 (2d Cir. 1988) (holding that patient who experienced severe side-effects as result of being administered Dilantin and phenobarbital for treatment of seizures could not recover against physician for failure to inform patient of risks associated with administration of such drugs because physician was faced with life-threatening situation requiring immediate action); *Connelly v. Warner*, 670 N.Y.S.2d 293, 295 (App. Div. 1998) (holding that intubation of patient who had become ventilator-dependent and then developed adult respiratory distress syndrome was emergency procedure so that alleged failure to advise patient of risks could not support informed consent claim).

Neither of Plaintiffs' experts testified about whether Ms. Hartmann consented to treatment for herself or for I.M. Neither expert testified about the sufficiency of the information provided to Ms. Hartmann about her or I.M.'s treatment. Plaintiffs have thus failed to proffer the required expert testimony to make out a lack of informed consent claim. *See Tropeano*, 80 N.Y.S.3d at 47 (affirming dismissal of lack of informed consent claim where the plaintiff's expert failed to demonstrate that the information disclosed to the plaintiff was insufficient); *Mitchell*, 970 N.Y.S.2d at 61 (same).

Moreover, Defendants provided emergency services to Ms. Hartmann and I.M. The Parties agree that a cord prolapse is a "true obstetric emergency," (Pls.' 56.1 ¶ 189), and that

I.M. was not breathing when she was born and was "as sick as you could get," (*id.* ¶¶ 22, 150–51).  The deviations from the standard of care that Plaintiffs' experts identified relate to Ms. Hartmann's emergency c-section and to the emergency resuscitation and stabilization efforts applied to I.M. immediately after delivery until her transfer to WMC.  (*See generally* Danoff Expert Rep.; Hamar Expert. Rep.)  Plaintiffs thus cannot make out a lack of informed consent claim because this case involves neither "(a) non-emergency treatment, procedure or surgery, [n]or (b) a diagnostic procedure . . ."  N.Y. Pub. Health Law § 2805–d(2); *Connelly*, 670 N.Y.S.2d at 295; *Shinn*, 675 F. Supp. at 100–01.

Nowhere in Plaintiffs' filings or memorandum opposing the Motions for Summary Judgment do Plaintiffs point to evidence about when consent should have been obtained and was not obtained.  Nor do they identify what information should have been provided and was not. Most importantly, Ms. Hartmann admitted that the signatures on the Consent for Surgical/Invasive Procedure form and the Consent for Anesthesia Services form are her signatures.  (Hartmann Dep. 147–48, 302–03.)  Ms. Hartmann testified she consented to I.M. being transferred to WMC.  (*Id.* at 236.)  "To survive a [summary judgment] motion . . . , [a nonmovant] need[s] to create more than a 'metaphysical' possibility that [her] allegations were correct; [s]he need[s] to 'come forward with specific facts showing that there is a *genuine issue for trial.*'"  *Wrobel*, 692 F.3d at 30 (quoting *Matsushita Elec. Indus. Co*., 475 U.S. at 586–87). The Court finds that Ms. Hartmann has failed to raise a triable issue with respect to her informed consent claim.

The Court therefore grants Nurse Hines's, Dr. Senguttuvan's, and ORMC and Nurse Bast's Motions for Summary Judgment with respect to Plaintiffs' lack of informed consent claim.

### 3. Loss of Services

Under New York law, a parent may not recover damages for loss of consortium resulting from a child's death or injury, but "[a] parent may recover for loss of services of a child upon a proper showing of the value of [the] lost services." *Santoro ex rel. Santoro v. Donnelly*, 340 F. Supp. 2d 464, 492–93 (S.D.N.Y. 2004) (internal citations omitted); *see also Martell v. Boardwalk Enters., Inc.*, 748 F.2d 740, 755 (2d Cir. 1984) (reducing damages awarded to plaintiff parents for loss of child's services because there was only "scanty evidence" including a few statements that child could no longer perform household chores such as helping with gardening, painting, and hanging wallpaper"); *Gilbert v. Stanton Brewery*, 67 N.E.2d 155, 156–57 (N.Y. 1946) (holding that a plaintiff mother was entitled to damages "including the value of her [child]'s services, if any, of which she was deprived and reasonable expenses necessarily incurred by the mother in an effort to restore the infant to health"); *Mercurio v. State*, 227 N.Y.S.2d 372, 377–78 (Ct. Cl. 1962) (mother of injured child permitted to recover for lost services where there was evidence that the child was working and contributing to the mother).[48] A parent's action for loss of services is derivative of the child's underlying claim. *See*

---

[48] The Restatement (Second) of Torts provides that:

One who by reason of his tortious conduct is liable to a minor child for illness or other bodily harm is subject to liability to (a) the parent who is entitled to the child's services for any resulting loss of services or ability to render services, and to (b) the parent who is under a legal duty to furnish medical treatment for any expenses reasonably incurred or likely to be incurred for the treatment during the child's minority.

Restatement (Second) of Torts § 703 (Am. Law. Inst. 1977). The Restatement further provides that even where a plaintiff parent cannot recover for the loss of services, "an action can be maintained for the expenses incurred or likely to be incurred in the child's care and treatment." § 703 cmt. g.

*Silverstein v. Bronxville Obstetrical & Gynecological Grp., P.C.*, 558 N.Y.S.2d 79, 81 (App. Div. 1990) (dismissing claim by plaintiff father where infant's underlying cause of action failed).

New York courts have allowed plaintiff parents to maintain actions for medical expenses incurred in an injured child's treatment even where they cannot recover for the loss of services. *See, e.g.*, *Guerriero v. Sewanhaka Cent. High School Dist.*, 55 N.Y.S.3d 85, 89–90 (App. Div. 2017) (holding that mother's derivative claim for loss of services and medical expenses could proceed only as to the medical expenses incurred by her for her son, because there was no evidence that the mother suffered any damages of loss of services.); *Turturro v. City of New York*, 5 N.Y.S.3d 306, 313 (App. Div. 2015) (reversing award to plaintiff mother for loss of child's services where there was no evidence of the value of lost services, but leaving intact award covering future medical expenses); *Foti v. Quittel*, 241 N.Y.S.2d 15, 16 (App. Div. 1963) (holding that where plaintiff mother failed to prove loss of services, she could either proceed with new trial or accept a reduction in award amount from $3,000, which reflected compensation for loss of services, to $697, which reflected only the special damages and medical expenses plaintiff did prove).

Nowhere in Plaintiffs' filings or memorandum opposing the Motions for Summary Judgment do Plaintiffs point to any evidence related to the loss of services Ms. Hartmann will incur due to I.M.'s injuries. Plaintiffs do not even offer "scanty evidence," about what services I.M. would have hypothetically been able to provide and will now not be able to provide. *See Martell*, 748 F.2d at 755 (reducing damages awarded to plaintiff parents for loss of child's services because there was only "scanty evidence"). The Court is not required to search the record for evidence of Ms. Hartmann's loss of services. *See Holtz*, 258 F.3d at 73.

Ms. Hartmann did, however, testify about the child's medical expenses incurred thus far, stating that she has an outstanding $60,000 bill from WMC for I.M.'s treatment that she has not been able to pay. (Hartmann Dep. 30.) She also testified that there are several smaller bills of a few hundred dollars each, as well as a $4,000 bill, each of which she has also been unable to pay. (*Id*. at 227–28.) She did not testify about I.M.'s future medical expenses.

"[W]hen the burden of proof at trial would fall on the nonmoving party, it ordinarily is sufficient for the movant to point to a lack of evidence to go to the trier of fact on an essential element of the nonmovant's claim," in which case "the nonmoving party must come forward with admissible evidence sufficient to raise a genuine issue of fact for trial in order to avoid summary judgment." *CILP Assocs., L.P.*, 735 F.3d at 123. Here, Plaintiffs have failed to come forward with any admissible evidence about what exactly the lost services would be. Ms. Hartmann's sworn testimony, however, is admissible evidence as to the medical expenses incurred in the treatment of I.M thus far. Thus, Ms. Hartmann raises a triable issue on the question of medical expenses, and she can maintain an action for medical costs. In the absence of any evidence about the lost services, she cannot, however, recover for the loss of services. *See Guerriero*, 55 N.Y.S.3d at 89–90 (denying recovery for loss of services but allowing recovery for medical expenses); *Turturro*, 5 N.Y.S.3d at 313 (same); *Foti*, 241 N.Y.S.2d at 16 (same).

The Court therefore denies Nurse Hines's, Dr. Senguttuvan's, and ORMC and Nurse Bast's Motions for Summary Judgment with respect to Plaintiffs' loss of services claim but only insofar as that claim relates to the medical expenses Ms. Hartmann testified she has incurred for the treatment of I.M. thus far.

### 4. Negligence Hiring and / or Supervision by ORMC

"New York law does not permit a claim for negligent hiring, training, retention[,] or supervision where the defendants act in the scope of their employment." *Schoolcraft v. City of New York*, 103 F. Supp. 3d 465, 522 (S.D.N.Y. 2015) (collecting cases) (internal citations omitted). "In instances where . . . an employer cannot be held vicariously liable for its employee's torts because they occur outside the scope of his employment, the employer can still be held liable under theories of negligent hiring, negligent retention, and negligent supervision." *Bouchard v. New York Archdiocese*, 719 F. Supp. 2d 255, 260–61 (S.D.N.Y. 2010) (internal citation, alterations, and quotation marks omitted).

To state a claim for negligent hiring, training, supervision or retention, "in addition to the standard elements of negligence, a plaintiff must show: (1) that the tort-feasor and the defendant were in an employee-employer relationship; (2) that the employer knew or should have known of the employee's propensity for the conduct which caused the injury prior to the injury's occurrence; and (3) that the tort was committed on the employer's premises or with the employer's chattels." *Ehrens v. Lutheran Church*, 385 F.3d 232, 235 (2d Cir. 2004) (citations and internal quotation marks omitted); *Bouchard*, 719 F. Supp. 2d at 260–61 (same). To prevail on such a claim, a plaintiff must establish, among other things, that "the employer knew or should have known of the employee's propensity for the conduct which caused the injury prior to the injury's occurrence." *Ehrens*, 385 F.3d at 235 (internal quotation marks omitted). "A cause of action for negligent hiring or retention requires allegations that the employer . . . failed to investigate a prospective employee notwithstanding knowledge of facts that would lead a reasonably prudent person to investigate that prospective employee." *Bouchard*, 719 F. Supp. 2d at 261 (internal quotation marks omitted).

"Summary judgment is appropriate where there is no proof that the employer . . . acted negligently in hiring, training, supervising or retaining an employee." *Tsesarskaya v. City of New York*, 843 F. Supp. 2d 446, 464 (S.D.N.Y. 2012) (granting summary judgment where the plaintiff failed to submit any evidence of the defendants' hiring, training, supervision or retention policies); *see also Hattar v. Carelli*, 09-CV-4642, 2012 WL 246668, at *5 (S.D.N.Y. Jan. 11, 2012) (granting summary judgment and dismissing negligent hiring and retention claim where the plaintiffs "failed to adduce any evidence that defendants improperly investigated any individual defendant").

Plaintiffs failed to submit any evidence of ORMC's hiring, training, supervision or retention policies. Plaintiffs also do not point to any evidence about improper investigation into any individual Defendant's background, nor any allegations of a propensity for conducting medical malpractice by any of the individual Defendants. Therefore, the Court grants ORMC's Motion for Summary Judgment as to Plaintiffs' claim for negligent hiring, training, retention or supervision.

### III.  Conclusion

For the foregoing reasons, the Court denies Dr. Senguttuvan, Nurse Hines, and ORMC and Nurse Bast's Motions for Summary Judgment with respect to the medical malpractice claim; denies ORMC and Nurse Bast's Motion for Summary Judgment on the question of vicarious liability with respect to non-employees and employees; denies Dr. Senguttuvan, Nurse Hines, and ORMC and Nurse Bast's Motions for Summary Judgment with respect to the loss of services claim, but only insofar as that surviving claim relates to the medical expenses Ms. Hartmann testified she incurred for the treatment of I.M. so far; grants Dr. Senguttuvan, Nurse Hines, and ORMC and Nurse Bast's Motions for Summary Judgment with respect to the lack of informed

consent claim; and grants ORMC and Nurse Bast's Motion for Summary Judgment as to

Plaintiffs' claim for negligent hiring, training, retention or supervision. The Clerk of Court is

respectfully directed to terminate the pending Motions. (Dkt. Nos. 111, 115, 124.) The Court

will hold a Status Conference on February 14, 2019 at 11:00am.

SO ORDERED.

DATED:    January 24 , 2019
         White Plains, New York

KENNETH M. KARAS
UNITED STATES DISTRICT JUDGE